**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**AMERICAN BUS ASSOCIATION, INC.,**      )
                                        )
                                        )
**v.**                                   )
                                        )        **Civil Action No. 10-686 (ESH)**
**PETER M. ROGOFF, Administrator,**      )
**Federal Transit Administration, and**  )
**THE FEDERAL TRANSIT**                  )
**ADMINISTRATION**                       )
                                        )
_____)

## APPLICATION FOR PRELIMINARY INJUNCTION

Plaintiff American Bus Association, Inc. ("ABA") hereby requests this Court issue a

preliminary injunction prohibiting Defendants Federal Transit Administration and its

Administrator, Peter M. Rogoff, from abiding by section 172 of Pub. L. No. 111-117, and

compelling Defendants to enforce the provisions of the Federal Transit Act and the Charter

Service Rule, 49 C.F.R. Part 604 (the "Charter Rule"), related to charter service provided by the

King County, Washington Department of Transportation's Metro Transit Division ("King

County Metro").  In support of this Application, ABA states as follows:

## INTRODUCTION

The Defendants purportedly may not enforce the Charter Rule against King County

Metro's charter bus service to Seattle Mariners baseball games and other events because of

Section 172 of the Transportation, Housing and Urban Development, and Related Agencies

Appropriations Act, 2010 (Pub. L. No. 111-117, § 172, 123 Stat. 3066 (Dec. 16, 2009)).  That

provision, added as an amendment to the law by United States Senator Patty Murray, provides:

> None of the funds provided or limited under this Act may be used to enforce
> regulations related to charter bus service under part 604 of title 49, Code of
> Federal Regulations, for any transit agency who during fiscal year 2008 was both
> initially granted a 60-day period to come into compliance with part 604, and then
> was subsequently granted an exception from said part.

*Id*. (the "Murray Amendment").  As noted herein, the Murray Amendment was designed solely

to benefit King County Metro, the only transit agency in the county that meets the terms of the

Amendment.

The Murray Amendment is unconstitutional.  It infringes upon the rights of ABA and its

member companies to petition the government for redress of grievances in violation of the First

Amendment to the United States Constitution.  It infringes upon the rights of ABA and its

member companies to due process and equal protection of law, in violation of the Constitution's

Fifth Amendment.  Finally, it infringes upon the concept of separation of powers, inherent in the

Constitution, which provides ABA and its member companies the right to seek adjudication of

their claims against King County before both the FTA and the federal courts.

ABA filed this action seeking a declaratory order that the Murray Amendment is

unconstitutional.  It also seeks a permanent injunction prohibiting the FTA and its Administrator

from abiding by the Murray Amendment, and compelling them to enforce the Charter Rule

against King County Metro.  Because King County Metro is providing illegal charter service

right now for events in the Seattle region, including for Seattle Mariners baseball games and

Seattle Sounders soccer games, ABA files this motion to obtain immediate relief so that the FTA

may act to enforce the Charter Rule before the end of those teams' seasons and provide an

opportunity for privately-owned charter operators to compete for that revenue.

## **BACKGROUND**

Plaintiff American Bus Association, Inc. is a national trade association representing the broad spectrum of commercial bus operators in the United States.  Its hundreds of bus operator members include companies engaged in fixed-route scheduled service, in charter service, or in a mixture of the two.  As the name implies, fixed-route, scheduled operators provide intercity bus service to passengers over routes designated in advance with regular schedules from which passengers can choose the best option for their transportation needs.  This case involves the provision of charter service by bus operators, specifically in the King County, Washington metropolitan region.

Charter service encompasses a broad array of transportation services that are not considered fixed-route scheduled services.  The infinite number and type of events for which members of the public wish to engage a charter bus make it difficult to define "charter service" with a one-size-fits-all approach.  Consequently, the concept of what constitutes charter service has changed over time.  Currently, the Federal Transit Administration ("FTA") defines charter service as follows:

> "Charter service" means, but does not include demand response service to individuals:
> (1) Transportation provided by a recipient at the request of a third party for the exclusive use of a bus or van for a negotiated price.  The following features may be characteristic of charter service:
>> (i) A third party pays the transit provider a negotiated price for the group;
>> (ii) Any fares charged to individual members of the group are collected by a third party;
>> (iii) The service is not part of the transit provider's regularly scheduled service, or is offered for a limited period of time; or
>> (iv) A third party determines the origin and destination of the trip as well as scheduling, or
> (2) Transportation provided by a recipient to the public for events or functions that occur on an irregular basis or for a limited duration and;
>> (i) A premium fare is charged that is greater than the usual or customary fixed route fare; or
>> (ii) The service is paid for in whole or in part by a third party.

49 C.F.R. § 604.3(c).  By its terms, this definition relies on an approach in which the FTA and those subject to the rule must look to the characteristics of each individual service and apply those characteristics to the rule's definition.

While the definition of charter service has changed over time, the purpose for the charter service rule has not.  The Charter Rule is necessary to protect private charter operators from unfair competition over charter service from public transit agencies that receive millions of dollars in federal subsidies every year.  *See* 49 C.F.R. § 604.1(a): "The purpose of this part is to implement 49 U.S.C. 5323(d), which protects private charter operators from unauthorized competition from recipients of Federal financial assistance under the Federal Transit Laws." Without those protections, private charter operators would be at an extreme economic disadvantage in providing charter service.  When one considers that the approximately ninety-five percent of the bus industry is made up of small businesses, such unfair competition with subsidized transit agencies is critical to the economic survival of private charter bus operators.

### The Statutory Scheme

This issue arises in the context of the Federal Transit Act, 49 U.S.C. § 5301 *et seq*. (the "FT Act").  The FT Act is designed to provide federal promotion and funding of local mass transportation, or transit, services throughout the United States.  Funds from FT Act programs make it possible for large and small transit systems to provide mass transportation by rail and bus.

The Federal Transit Administration and its Administrator are charged with executing the provisions of the FT Act.  49 C.F.R. §§ 1.45, 1.51.  The FTA's primary role is to dispense federal funds to local transit agencies – *i.e.*, public funding recipients or subrecipients – to plan, construct, maintain, and operate their transit systems.

Because these publicly funded transit agencies receive federal subsidies, Congress included in the FT Act an important restriction.  As a condition of receiving FTA funds, recipients must agree that they "will not provide charter bus transportation service outside the urban area in which it provides regularly scheduled public transportation service."  49 U.S.C. § 5323(d)(1).  The purpose of this condition is "to ensure that the assistance will not enable a [recipient] to foreclose a private operator from providing intercity charter bus service if the private operator can provide the service."  *Id*.

### The Charter Rule

To give effect to this restriction, the FTA has adopted its Charter Service Rule, 49 C.F.R. Part 604.  Though it has gone through several incarnations since its first adoption in 1976, the current rules have been in place since a comprehensive overhaul became effective in 2008.  The 2008 Final Rule was issued after representatives of interested parties from both the public and private sectors met in a negotiated rulemaking.  73 *Federal Register* 2326 (Jan. 14, 2008).  While some issues were agreed upon after consensus, the FTA decided upon other issues after notice and comment rulemaking.

In order to receive assistance under the Federal Transit Laws, recipients must enter into an agreement with the FTA stating as follows:

> The recipient agrees that it, and each of its subrecipients, and third party contractors at any level who use FTA-funded vehicles, may provide charter service using equipment or facilities acquired with Federal assistance authorized under the Federal Transit Laws only in compliance with the regulations set out in 49 CFR 604, the terms and conditions of which are incorporated herein by reference.

49 C.F.R. § 604.4(b).  The Charter Rule provides some limited exceptions, not relevant here, pursuant to which recipients may provide charter service.  49 C.F.R. Part 604, subpart B.

The Charter Rule establishes a system in which private charter operators may register as charter providers in their geographic area of operation.  49 C.F.R. § 604.13.  Operators who register "shall have standing to file a complaint [challenging a recipient's charter service] consistent with subpart F."  49 C.F.R. § 604.13(b).  If a recipient receives a request to provide charter service, it may decline to provide the service, provide the service under an exception to the Rule, or provide notice to private charter operators of its intent to provide charter service.  49 C.F.R. § 604.14(a).  If the recipient provides notice to registered private operators under the third option, registered private operators may inform the recipient that they have an interest in providing the service.  If no registered private operator expresses an interest, the recipient may provide the service.  49 C.F.R. § 604.9.

The Charter Rule provides two methods by which private charter operators may challenge a recipient's provision of, or intent to provide, charter service.  If the charter service has not yet taken place, an interested party may seek an advisory opinion and a cease and desist order from the FTA Chief Counsel.  49 C.F.R. Part 604, subpart E.  "An advisory opinion represents the formal position of FTA on a matter, and except as provided in § 604.25 of this subpart, obligates the agency to follow it until it is amended or revoked."  49 C.F.R. § 604.20(a).

As part of its request for an advisory opinion, an interested party may also seek a cease and desist order.  49 C.F.R. § 604.22(a).  The Chief Counsel may grant a cease and desist order "if the interested party demonstrates, by a preponderance of the evidence, that the planned provision of charter service by a recipient would violate this part."  49 C.F.R. § 604.24(a).  If a cease and desist order is issued, it must be considered as an aggravating factor in determining any remedy in any future violations by the recipient.  49 C.F.R. § 604.23(a).

For violations of the Charter Rule that have already occurred, the Rule provides a more elaborate adjudicatory scheme.  49 C.F.R. Part 604, subpart F.  Registered private operators affected by a recipient's noncompliance with the Charter Rule may initiate an action by filing a complaint with the FTA Chief Counsel.  49 C.F.R. § 604.27(a).  The complaint must set forth facts showing by a preponderance of the evidence that the recipient engaged in unauthorized charter service, and describe how the private operator was affected.  49 C.F.R. § 604.27(b)(3) and (4).  Complaints are filed in the Charter Service Complaint Docket, FTA-2007-0025.  49 C.F.R. § 604.31(b).  The Chief Counsel may dismiss a complaint if it is outside the FTA's jurisdiction, does not state a claim that warrants an investigation or further action by FTA, or if the complainant lacks standing.  49 C.F.R. § 604.28.

If the complaint is not dismissed (and is otherwise sufficient, *see* 49 C.F.R. § 604.29), the recipient is notified that it has 30 days to respond to the complaint.  49 C.F.R. § 604.27(c).  The complainant may file a reply within 20 days of the date of service of the respondent's answer.  49 C.F.R. § 604.27(c).  The respondent may file a rebuttal within 10 days.  49 C.F.R. § 604.27(e).  All documents must be served by the method set forth in the rule.  49 C.F.R. § 604.31.

If the FTA finds that, based on the pleadings, there is a reasonable basis for investigation, the FTA must initiate an investigation.  49 C.F.R. § 604.32(a).  The investigation may include the written submissions, further informal investigation by FTA, and any additional information provided by the parties at FTA's request.  49 C.F.R. § 604.32(b).  The investigation must be completed within 90 days after receipt of the last pleading.  49 C.F.R. § 604.32(c).  (FTA may also initiate investigations on its own initiative, without a formal complaint being filed.  49 C.F.R. § 604.33.)

After completing the investigation, the Chief Counsel may: (1) issue a decision based on the pleadings, (2) appoint a Presiding Official ("PO"), or (3) dismiss the complaint.  49 C.F.R. § 604.34(a).

If a PO is appointed, the Chief Counsel issues a hearing order notifying the parties of the issues to be decided, the relevant statutory, judicial, regulatory or other authorities, and such rules of procedure as may be necessary.  49 C.F.R. § 604.32(b).  The PO has the power to hold hearings and conferences, administer oaths and affirmations, issue deposition notices, decide on the extent of discovery, receive evidence, regulate the conduct of the hearing, hold settlement conferences, dispose of motions and requests, examine witnesses, and make findings of fact and conclusions of law.  49 C.F.R. § 604.36.

The parties are guaranteed the right to participate in hearings in person.  49 C.F.R. § 604.37(a).  They may be represented by counsel.  *Id*.  They may conduct discovery.  49 C.F.R. § 604.38.  They may take depositions.  49 C.F.R. § 604.39.  The hearings must be open to the public.  49 C.F.R. § 604.40(a).  The complainant has the burden of proof, by a preponderance of the evidence, to show that the recipient has not complied with the Charter Rule.  49 C.F.R. § 604.42.

At the conclusion of the hearing process, the PO must issue a recommended decision. The recommendation is sent to the FTA Chief Counsel, who may ratify or modify it within 30 days of receiving the recommended decision.  49 C.F.R. § 604.46.  If the Chief Counsel determines that a violation has occurred, he or she may; (1) bar the recipient from receiving future federal funding, (2) order a withholding of a reasonable percentage of available funds, or (3) pursue suspension or debarment of the recipient.  49 C.F.R. § 604.47(a).  The Chief Counsel must consider the nature and circumstances of the violation, the extent and gravity of the

violation, the revenue earned by providing the charter service, the recipient's operating budget, and any other matters as justice may require.  49 C.F.R. § 604.47(b).  If the recipient has engaged in a pattern of violations, the Chief Counsel must bar the recipient from receiving future federal assistance in an amount the Chief Counsel deems appropriate.  49 C.F.R. § 604.47(d).

Any party adversely affected by a decision of the Chief Counsel may appeal the decision to the FTA Administrator.  49 C.F.R. § 604.48(a).  The Administrator must review the entire record and issue a final agency decision that either accepts, rejects, or modifies the Chief Counsel's decision.  49 C.F.R. § 604.48(b).  (The Administrator may also initiate a review on his or her own initiative if no appeal is filed.  *Id*.)  A person may seek judicial review of the final decision and order of the Administrator by filing an action in an appropriate United States District Court.  49 C.F.R. § 604.50.

If no appeal is filed and the Administrator does not initiate a review, the Chief Counsel's decision becomes the final agency decision.  49 C.F.R. § 604.48(c).  If a party fails to file an appeal of the Chief Counsel's decision, that party waives any right to seek judicial review of the Chief Counsel's decision.  49 C.F.R. § 604.48(d).

### King County Metro is Providing Charter Service to Seattle Mariners Baseball Games

King County Metro is a recipient or subrecipient of FTA funds which provides public transportation services to the Seattle, Washington metropolitan region.  Like all other recipients/subrecipients, King County Metro has entered into agreements with the FTA that govern the use of funds received from the federal agency.  Included in those agreements is the provision, cited above, prohibiting King County Metro from providing charter bus service unless it is in compliance with the Charter Rule.  49 C.F.R. § 604.4.

Notwithstanding this contractual obligation, King County Metro is violating the Charter Rule.  In particular, it is providing charter service to home games of the Seattle Mariners baseball team and Seattle Sounders soccer team.  ABA believes that King County Metro is also providing charter service to other special events in the Seattle area.

As noted above, the definition of charter service includes, "Transportation provided by a recipient to the public for events or functions that occur on an irregular basis or for a limited duration and: (i) A premium fare is charged that is greater than the usual or customary fixed route fare; or (ii) The service is paid for in whole or in part by a third party."  49 C.F.R. § 604.3(c)(2).  The facts demonstrate that the service King County Metro provides to Mariners games is charter service.

 King County Metro's website has announced that it is "'back in the game' with special service to Sounders and Mariners games."  *See* Exhibit A to Pantuso Affidavit.  The site states that King County Metro "will operate shuttles between three park-and-ride lots and Qwest Field for the Sounders, and from four locations for Mariners games at Safeco Field."  *Id*.  The special service to Sounders games began April 3, 2010 for the current season.  Special service to Mariners games began on April 13.

For Mariners games, the special service is offered both to and from the stadium for weekend games, and only after the game for weeknight games.  King County Metro offers no special service for weekday games, "since there is plenty of regular weekday bus service near the stadiums."  *Id*.

King County Metro will charge $5.00 each way for rides on this "special" service, and passengers are not entitled to use passes, ORCA cards, or transfers, as they would on regular service.  *Id*.  The $5.00 fare represents a premium above King County Metro's regular fare for

similar service.  For example, the regular cash fare for a trip from the Eastgate park-and-ride (one of the park-and-ride locations served by the special service) to 5th Avenue South and South Jackson Street near Safeco Field is $4.50.  The reduced fare with permit for the same trip is $2.00.  *Id*.

There can be no doubt that the "special" service to Mariners and Sounders games is charter service.  It is "Transportation . . . to the public for events or functions that occur on an irregular basis or for a limited duration," and a "premium fare is charged that is greater than the usual or customary fixed route fare."  49 C.F.R. § 604.3(c)(2)(i).

Moreover, the service being provided by King County Metro is virtually identical to the service it provided during the 2008 baseball season, which the FTA found to be charter service. In 2008, King County Metro sought an exception from the Charter Rule to continue to provide charter service to Mariners games for the 2008 season.  Recognizing that the newly adopted Charter Rule prohibited King County Metro from providing this kind of service, it submitted a petition to FTA for an exception on March 31, 2008, the day of the first Mariners home game. King County Metro argued that the service fell within the Charter Rule's exception for a "unique and time sensitive event" because the first game of the Mariners season was to begin on the same day and the service had been widely advertised to the general public.  The FTA Administrator denied the petition on the basis that an exception could be granted for a unique and time sensitive event.  Department of Transportation Dockets, FTA-2007-0022-0035 (Letter Decision of the Administrator dated April 29, 2008).  However, the Administrator granted a 60-day exception, allowing King County Metro to "either consult[] registered charter providers in support of a petition for an exception for an event of regional or national significance or issue a notice to turn over all of the service to an interested registered charter provider."  *Id*.

King County Metro later filed a second petition, seeking an exception from the Charter Rule for the entire 2008 Mariners season.  King County Metro argued that the Mariners had not been able to come to an agreement with privately-owned charter operators to provide charter service, and cessation of King County Metro's service would leave passengers without service. Sensitive to the needs of passengers going unmet, the Administrator granted an extension of the exception for the remainder of the Mariners' season.  Department of Transportation Dockets, FTA-2007-0022-0075 (Decision of the Administrator in No. 2008-14, June 27, 2008).  In doing so, the Administrator stated:

> Congress has from FTA's very beginning (under FTA's original authorization statute, the Urban Mass Transportation Act of 1964) through FTA's current authorization statute (the Safe, Accountable, Flexible, Efficient Transportation Equity Act, a Legacy for Users, enacted in 2005), directed that FTA funds cannot be used for charter service.  FTA's current charter regulations (developed pursuant to Congressional direction under a negotiated rule-making process) set forth how this mandate is to be implemented.

*Id*.  Thus, the FTA recognized conclusively that the service provided by King County Metro was charter service, and that FTA's authorizing statute and rules prohibited such service.  The only reason an exception was granted in the unique circumstances of that proceeding was so that passengers would not be left without transportation.

If it were not enough that the FTA and King County Metro itself recognized the transportation to Mariners games was charter service, even this Court recognized it.  The United Motorcoach Association, Inc. brought suit challenging FTA's decision to allow King County Metro to provide the service, but the case was ultimately dismissed for mootness as the baseball season had concluded before the Court could reach the merits of the claim.  Memorandum Opinion in *United Motorcoach Association, Inc. v. Welbes*, Civil Action No. 08-1648 (ESH) (D.D.C. May 5, 2009)("Memorandum Opinion").  However, this Court found that King County Metro was providing charter service in violation of the Charter Rule.  *See* Memorandum Opinion

at p. 4 ("However, pursuant to the newly amended charter service regulation, King County Metro's Mariners service constituted 'charter service.'").

Tellingly, King County Metro did not provide special charter service to Mariners games during the 2009 season.  Citing the Charter Rule, King County Metro announced that it could not provide special service to and from park-and-ride games, as it had in the past.  Perhaps knowing that the FTA would likely not grant another exception, King County Metro did not file a petition for the 2009 season.  Now, however, with the adoption of the Murray Amendment, King County Metro feels it may ignore the Charter Rule and provide charter service without penalty.

### The Murray Amendment Takes Away the Right of ABA and Its Members to Seek Relief from FTA

On December 16, 2009, the President signed into law the Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2010 ("Transportation Appropriations Act"), which was contained in Division A of the Consolidated Appropriations Act, 2010, Pub. L. No. 111-117 (Dec. 16, 2009).  The Murray Amendment was adopted as section 172 of the Transportation Appropriations Act.

As noted, it prohibits the FTA from using funds to enforce the Charter Rule against King County Metro, the only transit agency which meets the terms of the Amendment.  As a result, the FTA may not entertain any requests for an advisory opinion under 49 C.F.R. Part 604, Subpart E. It may not entertain requests for and issue cease and desist orders under 49 C.F.R. § 604.22.  It may not receive complaints from aggrieved privately-owned charter operators under Subpart F of the rule.  It may not conduct investigations under Subpart G of the rule.  It may not appoint a Presiding Official under Subpart H of the rule.  It may not conduct hearings and receive evidence and arguments under Subpart I.  Nor may the agency impose remedies for King County Metro's breach of the Charter Rule under 49 C.F.R. § 604.47.

13

The Murray Amendment takes away the right of ABA and its member companies to participate in all of those procedures designed to protect them from the provision of illegal charter service by publicly subsidized transit agencies.  They may not conduct discovery, question witnesses or present evidence.  They are prohibited from appealing to the FTA Administrator or to the courts if an adverse decision is reached by the FTA.  In sum, the Murray Amendment completely strips ABA and its member companies from all the rights guaranteed by the FT Act and the Charter Rule with regard to the charter service provided by King County Metro.  Such an act is unconstitutional, and must be declared as such by this Court.

## ARGUMENT

"To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The Court must "'balance the strengths of the requesting party's arguments in each of the four required areas.'"  *Id*. (*quoting CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak."  *Id*.

1.    **ABA Can Demonstrate a Substantial Likelihood of Success on the Merits on Each of Its Claims**

    a.    **The Murray Amendment Violates the First Amendment**

The First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a

redress of grievances."  The right to petition is one of the fundamental rights guaranteed to

citizens of the United States, on par with the right to free speech, to freely exercise the religion of

their choice, and to assemble peaceably.  *United Mine Workers v. Illinois State Bar Assoc.*, 389

U.S. 217, 222 (1967) ("the rights to assemble peaceably and to petition for a redress of

grievances are among the most precious of the liberties safeguarded by the Bill of Rights.");

*McDonald v. Smith*, 472 U.S. 479, 482 (1985) ("The right to petition is cut from the same cloth

as the other guarantees of [the First] Amendment . . . .").  "The right to petition the Government

is part of our heritage from earliest times and represents a cornerstone of our national liberty.  It

is a right long-recognized as implicit in 'the very idea of a government, republican in form.'"

*United States Postal Service, v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 872 (D.D.C. 1986)

(*quoting United States v. Cruikshank*, 92 U.S. 542, 552 (1875)).

When the Congress adopts a law that infringes on the right of a citizen to petition the

government, at stake is not merely the denial of the individual grievance for which the citizen

seeks redress, but the entire fabric of individual liberty guaranteed by the Bill of Rights.  *Van*

*Deelen v. Johnson*, 497 F.3d 1151, 1155 (10th Cir. 2007) ("The promise of self-government

depends on the liberty of citizens to petition the government for the redress of their grievances.

When public officials feel free to wield the powers of their office as weapons against those who

question their decisions, they do damage not merely to the citizen in their sights but also to the

First Amendment liberties and the promise of equal treatment essential to the continuity of our

democratic enterprise.").

Because of the fundamental nature of the right to petition the government and its utter

importance in the preservation of liberty, courts subject congressional actions that infringe on

that right with "the closest scrutiny."  *See Buckley v. Valeo*, 424 U.S. 1, 25 (1976) ("In view of

the fundamental nature of the right to associate, governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.'" (quoting *NAACP v. Alabama*, 357 U.S. 449, 461 (1958))).  Because the right to petition is a fundament constitutional right, the court may uphold a congressional act which abridges that right only if the act is "suitably tailored to serve a compelling state interest."  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (using "strict scrutiny" test when a fundamental right is affected by legislation); *see also Buckley*, 424 U.S. at 25 ("Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." (internal quotation omitted)).

The strict scrutiny test is appropriate when the fundamental right of petition for redress of grievances has been abridged by the government.  *Int'l Union UAW v. National Right to Work Legal Defense and Education Found., Inc*., 433 F. Supp. 474, (D.D.C. 1977) ("There can be no doubt that if the proviso's infringement on first amendment rights is justified by a 'sufficiently compelling' governmental interest, and if the means chosen to effectuate that governmental interest is 'closely drawn to avoid unnecessary abridgement of [first amendment] freedoms,' then the proviso would be constitutional.  However, '[in] view of the fundamental nature' of the first amendment rights infringed upon by the proviso, the Court must subject the proviso 'to the closest scrutiny.'" (internal citations omitted)).

The courts have not hesitated to uphold this basic, fundamental right in a wide array of circumstances.  In *United Mine Workers*, the Supreme Court held that the union had a right to hire an attorney on salary to represent its members on workers' compensation claims, and that an

injunction preventing the employment of that attorney violated the freedom of speech, assembly and petition. *United Mine Workers*, 389 U.S. at 355-56.

In *Van Deelen*, the Tenth Circuit found that a plaintiff could state a claim of unlawful retaliation by government officials who impeded on his right to petition the government in relation to tax challenges. *Van Deelen*, 497 F.3d at 1156. In reversing the District Court, which had found no constitutional violation because the plaintiff's tax challenges were not matters of "public concern," the Circuit Court "reaffirm[ed] that the constitutionally enumerated right of a private citizen to petition the government for the redress of grievances does not pick and choose its causes but extends to matters great and small, public and private." *Id.* at 1153.

In *United States Postal Service*, the Postal Service attempted to prevent Hustler Magazine from sending copies of its issues to members of Congress, pursuant to 39 U.S.C. § 3008. The court held that Hustler sent the magazines to Congress as part of its right to petition the government, and that § 3008 could not be used to prevent the mailings. *United States Postal Service*, 630 F. Supp. at 872-73. The court stated that "a prohibitory order under § 3008 would effectively deny defendants' right to petition Congress at all." *Id.* at 873.

In addition to access to Congress, the right to petition the government for redress of grievances includes the right to access federal agencies and courts. *California Motor Transport Co., v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (the right to petition under the First Amendment extends to "the approach of citizens or groups of them to administrative agencies . . . Certainly the right to petition extends to all departments of the Government."); *Roberts v. Pennsylvania Department of Public Welfare*, 199 F. Supp. 2d 249, 252 n.10 (E.D. Pa. 2002) (same).

There is no question that the Murray Amendment presents an unconstitutional infringement on the right of ABA and its members to petition the government for a redress of grievances.  The FT Act and the Charter Rule guarantee that privately-owned charter operators should not be subject to unfair competition from subsidized transit agencies.  If a transit agency violates the Charter Rule by providing charter service, the Rule has established mechanisms through which privately-owned operators, or groups of them, may challenge that unlawful service.  Charter operators may seek an advisory opinion or cease and desist order under 49 C.F.R. Part 604, Subpart E.  They may file a complaint and be entitled to obtain evidence, present witnesses, and make argument before the FTA.  They may appeal adverse decisions of the FTA's Chief Counsel to the FTA Administrator, and finally to the courts if necessary.  In sum, they may avail themselves of a fair and comprehensive adjudicatory process by which the FTA can determine whether the Charter Rule has been violated and, if it has, to determine the appropriate remedy for that violation.

The FT Act and the Charter Rule combine to give privately-owned charter operators and associations access to the FTA to challenge acts of transit agencies for violations of the Rule.  In other words, the Charter Rule provides the very means by which privately-owned operators may seek a redress of grievances brought about by illegal charter service.  The Murray Amendment, however, takes that access away.  There can be no clearer instance of an Act of Congress abridging the right to petition the government for redress of grievances.

In the face of this unabashed denial of access to the FTA and the courts, there appears to be no compelling, or even legitimate, governmental interest advanced by the Murray Amendment.  The effect of the Murray Amendment is to permit King County Metro to provide charter service without any regard for the restrictions on such service in the Charter Rule.  It

ignores the FT Act's mandate that subsidized transit agencies be prohibited from unfairly competing with privately-owned operators for the provision of charter service, a mandate intended to protect privately-owned operators from an uneven marketplace.

Put another way, it is simply impossible for the Murray Amendment to serve a legitimate or compelling governmental interest by prohibiting enforcement of the Charter Rule when the FTA serves an opposite governmental interest by enforcing the Charter Rule in the rest of the country.  Far from advancing a compelling or legitimate interest, the Murray Amendment actually thwarts the government's interest, expressed in the FT Act, that privately-owned operators should not be forced to compete with subsidized transit agencies for the same service.

Certainly, the federal government has a legitimate interest in supporting public transportation through the subsidies provided to state and local transit agencies.  But even if the interest in public transportation can be advanced by allowing transit agencies to provide charter service in some circumstances, that interest is already sufficiently protected by the FTA through its enforcement of the Charter Rule and individual grant agreements.  The FT Act and the Charter Rule have been established to balance the transit agencies' desire to provide charter service with the need to protect privately-owned operators from unfair competition.  The FTA is charged with reviewing each circumstance in which a transit agency is alleged to have engaged in illegal charter service.  The agency may grant exceptions to the charter rule in cases of hardship, for unique and time sensitive events, for events of regional or national significance, and for other purposes.  49 C.F.R. § 604.11.  (King County Metro has not sought an exception to provide the service in question this year, however, and instead seeks to prevent the registered private charter operators in the Seattle area from raising any complaints about the service.)

Thus, because the government's interest in advancing public transportation is already met through the FT Act and the Charter Rule, the Murray Amendment is not narrowly tailored to serve that interest.

**b.    The Murray Amendment Also Violates Fifth Amendment Due Process Rights**

The Fifth Amendment to the United States Constitution provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . ."  When parties are forced to settle disputes with an adjudicatory process, the Due Process Clause requires, at a minimum, the right to be heard.  *Boddie v. Connecticut*, 401 U.S. 371, 377-78 (1971) ("[T]here can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" (*quoting Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306 (1950))).

To determine whether a Due Process violation has occurred, the court must first determine if the complainant was deprived of a protected property or liberty interest, then determine what process the complainant was due.  *Logan v. Zimmerman Brush Co*., 455 U.S. 422, 428 (1982) ("At the outset, then, we are faced with what has become a familiar two-part inquiry: we must determine whether Logan was deprived of a protected interest, and, if so, what process was his due.).  The Supreme Court has made clear that a statutorily-created cause of action, which can be adjudicated by a court or state agency, is a constitutionally-protected property interest.

*Logan* dealt with a claim by an employee that he was fired from his position because of a physical handicap, in violation of the Illinois Fair Employment Practices Act.  *Id*. at 426.  The FEPA gave the Illinois Fair Employment Practices Commission strict timelines to handle

complaints.  *Id*. at 424-25.  When, through the fault of a Commission employee, the complaint

was not heard within the statutory deadline, the complaint was dismissed and Logan lost any

opportunity to have his case adjudicated by the Commission.  *Id*. at 426-27.  The United States

Supreme Court, however, held that dismissing Logan's claim without an opportunity for a

hearing deprived him of due process.

The Court found that the FEPA had created a property interest in the cause of action

Logan had filed.  Citing the two-part Due Process test, the Court stated, "The first question, we

believe, was affirmatively settled by the *Mullane* case itself, where the Court held that a cause of

action is a species of property protected by the Fourteenth Amendment's Due Process Clause."

*Id*. at 428.   The Court noted that it "traditionally has held that the Due Process Clauses protect

civil litigants who seek recourse in the courts, either as defendants hoping to protect their

property or as plaintiffs attempting to redress grievances."  *Id*. at 429.  The Court found that the

deprivation of access to an agency adjudicatory process was analogous to the long line of cases

holding that a deprivation of access to courts violates due process.  *Id*. at 430 n.5 ("The Court's

cases involving the right of access to courts provide an analogous method of analysis supporting

our reasoning here. . . . [H]aving made access to the courts an entitlement or a necessity, the

State may not deprive someone of that access unless the balance of state a private interests favors

the government scheme." (*citing Boddie*, 401 U.S. at 377, and others)).

The Court stated, "The hallmark of property, the Court has emphasized, is an individual

entitlement grounded in state law, which cannot be removed except 'for cause.'"  *Id*.  The Court

then found that "[t]he right to use the FEPA's adjudicatory procedures shares these

characteristics.  A claimant has more than an abstract desire or interest in redressing his

grievance: his right to redress is guaranteed by the State, with the adequacy of his claim assessed

under what is, in essence, a 'for cause' standard." *Id*. at 431. In essence, the Court concluded, once the legislature provides a property interest, it may not take it away absent a hearing on the merits. *Id*. at 432 ("'While the legislature may elect not to confer a property interest, . . . it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. . . .'" (*quoting Vitek v. Jones*, 445 U.S. 480, 490-91 (1980))).

This Court has also recognized that a property interest is created when the legislature has established a cause of action. *Jung v. Association of American Medical Colleges*, 339 F. Supp. 2d 26, 43 (D.D.C. 2004) (the *Logan* Court "concluded that it was a denial of due process to create a cause of action in which parties have a property right and then to allow the state to take that right away without providing the party with any judicial forum."). The court in *Jung* found *Logan* inapplicable in that case because the statute at issue "does not deny plaintiffs a forum in which to bring their claim." *Id*.

In the present case, the FT Act confers a property interest on ABA and its members who are aggrieved by the provision of illegal charter bus service. The Act guarantees that privately-owner charter operators will be free from unfair competition from publicly subsidized transit agencies. To implement that restriction, the FTA has developed in the Charter Rule a comprehensive adjudicatory process to remedy violations of the rule. Similar to the state statute in *Logan*, Congress has thus created a property right by creating a "cause of action" that must be adjudicated by the agency according to its rules.

The Murray Amendment, however, takes away that property right for any party seeking to challenge charter service conducted by King County Metro. It effectively denies any forum whatsoever for ABA and its members to challenge King County Metro's charter service. As in

*Jung*, it is a "denial of due process" because the Murray Amendment has taken "that right away without providing the party with any judicial forum." *Jung*, 339 F. Supp. 2d at 43.

> **c.    The Murray Amendment Violates Fifth Amendment Equal Protection Rights**

The Fourteenth Amendment to the United States Constitution makes it unconstitutional for a state to "deny to any person within its jurisdiction the equal protection of the laws." This Equal Protection Clause has been found to restrict acts of Congress as well as of the states. *Bolling v. Sharpe*, 347 U.S. 497 (1954). Thus, Congress is constrained against adopted laws which do not "afford similar treatment to similarly situated persons." *News America Publishing, Incorporated v. Federal Communications Comm'n*, 844 F.2d 800, 804 (D.C. Cir. 1988).

This Circuit has adopted a "heightened rational basis scrutiny" standard to allegations of equal protection violation. *Ruggiero v. FCC*, 317 F.3d 239 (2003) ("Although equal protection analysis focuses upon the validity of the classification rather than the speech restriction, 'the critical questions asked are the same.' *Community-Service Broad. of Mid-America, Inc. v. FCC*, 192 U.S. App. D.C. 448, 593 F.2d 1102 (D.C. Cir. 1978) (*en banc*). We believe that the same level of scrutiny, heightened rational basis, is therefore appropriate in both contexts . . .); *see also News America*, 844 F.2d at 811 (noting "the overlap [of First Amendment analysis] with equal protection precepts"), and 814 ("What suffices for this case is that more is required than 'minimum rationality.'").

To determine whether the Murray Amendment violates the Equal Protection Clause, this court need look no further than the D.C. Circuit Court of Appeals' decision in *News America*. The court there held that a Congressional provision, tucked within a 471-page Continuing Resolution, did not afford News America Publishing, owned by Rupert Murdoch, the equal protection of the laws. The provision, though not mentioning News America by name, applied

23

by its unique terms only to that broadcasting company.  *Id.* at 810 ("But the constitutional discussion should proceed on a realistic basis: the clause impinges on a closed class, consisting exclusively of Murdoch.").

The court noted that "Congress's exclusive focus on a single party clearly implicates values similar to those behind the constitutional proscription of Bills of Attainder. . . .  The safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens."  *Id.* at 813.  In that case, the appeals court found the amendment at issue "strikes at Murdoch with the precision of a laser beam."  *Id.* at 814.  The only question was whether the amendment corresponded with any "legitimate public purpose."  *Id.*

The Court found the rationale proffered by the FCC to be inadequate to justify the disparate treatment of News America.  The FCC posited that the amendment was rational because Congress could have wanted to avoid broadcasters seeking so many temporary extensions of the cross-ownership rule that they were, in effect, getting permanent waivers.  *Id.* The Court found that, "[m]easured in terms of this purpose, the Amendment is astonishingly underinclusive."  *Id.*  Only News America would be affected by the ban on waiver extensions. The court concluded,

> In short, every publisher in the country other than Murdoch can knock on the FCC's door and seek the exercise of its discretion to secure, either by a single temporary waiver or by a waiver coupled with an extension, a period of exemption from the cross-ownership restrictions longer than that to which News America is restricted as a matter of law.  Congress's device bears only the most strained relationship to the purpose hypothesized by the Commission.

*Id.* at 814.

The similarities between the *News America* case and the Murray Amendment are so striking as to be almost identical.  The Murray Amendment, like the amendment in *News America*, was added as a minor provision in a large appropriations bill.  Though the Murray

Amendment did not name King County Metro by name, it could apply only to that transit agency by its unique terms. Like the amendment in *News America*, the Murray Amendment's focus on a single transit agency has negative implications on only a select group of citizens – *i.e.,* privately-owned charter operators in the Seattle metropolitan area. By "zeroing in" on this "small class" of operators "like a laser beam," the Murray Amendment "threatens the safeguards of [our] pluralistic political system."

The only question is whether there is any legitimate public purpose behind the Murray Amendment. Without the benefit of any legislative history, it is impossible to know Congress's motives. Whatever motive might be preferred, however, cannot overcome the heightened scrutiny to which it must be subjected. The reasoning of *News America* is particularly apt here: Because every other charter operator in the country can avail itself of the FTA's Charter Rule protections and procedures, except those in King County, Washington, any possible justification for the Murray Amendment will be unpersuasive. What legitimate public purpose can be achieved by allowing every other charter operator in the country to "knock on the [FTA's] door and seek the exercise of its discretion to secure" redress of charter violations, but denying that right to operators in King County? King County Metro stands in no different position than any other subsidized transit agency in the country, and need not rely on any special treatment from a minor provision slipped into a massive appropriations bill for its benefit.

In sum, the Murray Amendment violates the Equal Protection Clause. It singles out privately-owned charter operators in King County, Washington for disparate treatment while others around the country are not subject to its restrictions. It deprives a limited class of citizens the right to pursue charter complaints before the FTA, and there is no legitimate public purpose that can justify the amendment. For those reasons, it must be struck down.

### d.    The Murray Amendment also Violates Separation of Powers

Though not stated explicitly in the text of the Constitution, from the very beginning of the Republic there has been recognized in the document an inherent intent that the three branches of government remain largely separate. *Buckley v. Valeo*, 424 U.S. at 120 ("Our inquiry of necessity touches upon the fundamental principles of the Government established by the Framers of the Constitution, and all litigants and all of the courts which have addressed themselves to the matter start on common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another."); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 678 (D.C. Cir. 2008) ("Although not expressly included in the Constitution itself, the principle of separation of powers is implicit in the first three articles of the Constitution that define separate roles for the legislative, executive, and judicial branches."). Thus, "'it is a breach of the National fundamental law if Congress gives up its legislative power and transfers it to the President, or to the Judicial branch, *or if by law it attempts to invest itself or its members with either executive power or judicial power.*'"  *Buckley*, 424 U.S. at 121-22 (*quoting Hampton & Co. v. United States*, 276 U.S. 394, 406 (1928) (emphasis added)).

The Murray Amendment violates the separation of powers principle by investing Congress with both executive and judicial power.  It encroaches on the executive branch's ability to enforce the Charter Rule, and to effectively oversee its grant funds, by removing the FTA's power to conduct investigations into Charter Rule violations by King County Metro.  It also encroaches on the FTA's judicial role by preventing the adjudication of complaints brought by privately-owned charter operators.

Although the separation of powers doctrine does not act as a complete bar to the ability of Congress to impose upon the executive branch's ability to enforce the law, *see Free Enterprise Fund*, 537 F.3d at 681 n.11, there are limits to that intrusion.  The court in *Free Enterprise Fund* emphasized the difference between Congressional intrusions which preserve the ability of the Executive to execute and enforce the laws, and those that completely take that ability away.  *Id*. at 682-83.

The court found that, even though the act at issue in that case limited the ability of the President to remove members of the Public Company Accounting and Oversight Board, it did not take away all of his influence over the removal of Board members.  *Id*. ("[T]he President is not, as the Fund contends, 'completely stripped' of his ability to remove Board members . . ."). The court rejected suggestions that "the Board's creation represents an effective diminution of Executive Branch power or an unprecedented Congressional innovation . . ." *Id*. at 683 n.13. The proper inquiry, at least in removal-power cases, is "not formal but functional:  The analysis . . . is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id*. at 682 (*quoting Morrison v. Olsen*, 487 U.S. 654, 689-90 (1988)).

In this case, however, the Murray Amendment has "completely stripped" the FTA and its Administrator of the ability to enforce the Charter Rule.  The Charter Rule is designed to implement 49 U.S.C. § 5323(d) of the FT Act.  49 C.F.R. § 604.1(a).  It allows the FTA to review requests by transit agencies to allow charter service by those agencies under certain enumerated exceptions.  49 C.F.R. Part 604, Subpart B.  It allows the FTA to issue advisory

opinions and to issue cease and desist orders upon request.  49 C.F.R. Part 604, Subpart E.  It

allows the FTA to conduct investigations, both based on pleadings in cases where complaints

have been filed, and on its own initiative without having received a complaint.  49 C.F.R. Part

604, Subpart G.  In short, the governing statute and the Charter Rule provide a comprehensive

scheme for the FTA to carry out its executive function – the "faithful execution" of the law.

The ability of the FTA to enforce the Charter Rule is also an essential element of the

FTA's grant program.  The Charter Rule provides that a recipient seeking FTA funds must enter

into a Charter Service Agreement.  49 C.F.R. § 604.4.  The Agreement states that the recipient

may provide charter service only in accordance with the Charter Rule.  *Id*.  The Agreement is

included in the grants and assurances recipients must execute as a prerequisite to receiving FTA

funds.  *Id*.

By taking away its ability to enforce the Charter Rule, the Murray Amendment

completely strips the FTA of the ability to "take care that the [FT Act] be faithfully executed" in

relation to King County Metro, and to adequately oversee the lawful use of its grant funds to that

transit agency.  The effect is that the FTA has no ability to conduct investigations, either on its

own initiative or after receiving a complaint.  It has no ability to assess the need for exceptions to

the Rule – indeed, no exception is needed because King County Metro can flout the Charter Rule

at its whim.  The FTA has no ability to issue advisory opinions or cease and desist orders, or to

conduct hearings and issue rulings, to carry out its function of protecting privately-owned charter

operators from unfair competition, as required in 49 U.S.C. § 5323(d).  Nor does the FTA have

any ability to adequately oversee its own grant funds provided to King County Metro.  The

Murray Amendment completely takes away the FTA's ability to carry out the law in King

County.  That is the very type of intrusion into the executive function that, under *Free Enterprise Fund*, would violate the separation of powers.

In addition to the FTA's executive function in enforcing the FT Act and overseeing its grant funds, it also acts in an adjudicatory capacity when handling complaints, requests for advisory opinions, and requests for cease and desist orders.  When administrative agencies act as adjudicators, they are acting in a judicial capacity.  *See United States v. Morgan*, 313 U.S. 409, 422 (1941) (in holding that the Secretary of Agriculture should not have been subjected to questioning in the district court, the Court stated, "The proceeding before the Secretary 'has a quality resembling that of a judicial proceeding.'  *Morgan v. United States*, 298 U.S. 468, 480.  Such an examination of a judge would be destructive of judicial responsibility. . . . Just as a judge cannot be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected.").  The Murray Amendment thus also improperly encroaches on the judicial function of the FTA by completely stripping it of any power to hear disputes that relate to King County Metro.  Because the Charter Rule also allows parties to appeal decisions of the Administrator to the courts under the Administrative Procedure Act, 49 C.F.R. t 604, Subpart K, the Murray Amendment also arguably infringes on the judiciary's ability to hear appeals of final agency actions.

### 2.    ABA and Its Members Are Suffering Irreparable Injury

The United States Court of Appeals for the District of Columbia Circuit has held that allegations of First Amendment violations, including violations of the right to petition the government for redress of grievances, constitute irreparable harm *per se*.  *Chaplaincy of Full Gospel Churches, v. England*, 454 F.3d 290, 299 (D.C. Cir. 2006) (holding that a violation of First Amendment's Establishment Clause "*per se* constitutes irreparable harm").  The Court in

*Chaplaincy* noted that it has followed the three-judge plurality in *Elrod v. Burns*, 424 U.S. 347

(1976), and subsequent cases, to hold that irreparable harm is shown when "the operative First

Amendment liberties allegedly violated were variants of expressive liberties, such as the rights to

speak, associate, *petition*, or exercise one's religion." *Chaplaincy*, 454 F.3d at 300 (emphasis

added). The court also noted an additional requirement: that movants "must also establish they

are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly

impermissible government action would chill allowable individual conduct." *Id.* at 301. To do

so, "movants must show that their 'First Amendment interests are either threatened or in fact

being impaired at the time relief is sought.'" *Id.* (*quoting National Treasury Employees Union v.*

*United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991)). The court made it clear that

irreparable harm is presumed where the restriction on First Amendment rights is direct. *Id.* ("As

the Second Circuit has stated: 'Where a plaintiff alleges injury from a rule or regulation that

directly limits speech, the irreparable nature of the harm may be presumed . . .'" (*quoting Bronx*

*Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003))).

Beyond the *per se* irreparable harm presumption for First Amendment allegations, other

courts have found, or at least assumed, irreparable injury occurs if movants are denied other

constitutional protections, at times even employing a *per se* standard for due process violations.

*Blackman v. District of Columbia*, 277 F. Supp. 2d 71, (D.D.C. 2003) ("Where there is a denial

of a free appropriate education because no hearing has been held and no determination has been

issued, and a proper placement therefore has not been made, there results a *per se* harm to the

student and the irreparable injury requirement of a preliminary injunction has been satisfied.");

*but see Lightfoot v. District of Columbia*, 2001 U.S. Dist. LEXIS 25866 (D.D.C. Oct. 29, 2001)

(finding no *per se* irreparable injury in alleged due process violation in relation to denial of pre-

termination benefits under the Comprehensive Merit Personnel Act).  In *Brown v. Eppler*, 2009 U.S. Dist. LEXIS 105140 (N.D. Okla. Nov. 6, 2009), the plaintiff sued the Metropolitan Tulsa Transit Authority and others, alleging that he was removed from city buses, and subsequently banned from boarding any city buses, in violation of his rights to due process and equal protection.  The District Court cited the Tenth Circuit's holding in *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001), that "in the context of a First Amendment case . . . 'when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'"  *Id.* at *10.  After noting that it was "unclear whether a presumption of irreparable injury applies to all constitutional claims," the court did make that presumption "that an infringement of Brown's equal protection or due process right is irreparable injury."  *Id.* at *10-11.

Even under the "high standard for irreparable injury," *id.* at 297, Plaintiffs in this case can meet the standard.  ABA alleges that the Murray Amendment deprives it and its members of the right to petition the government for redress of grievances, a First Amendment violation that *per se* constitutes irreparable harm.  *See, Chaplaincy*, 454 F.3d at 300.  ABA has presented evidence that it is prepared to challenge King County Metro's provision of charter service to Mariners games and other special events before the FTA, and is prevented from doing so only because of the Murray Amendment.  *See* Pantuso Affidavit at 4.  Thus, ABA has shown that it "will be engaging in constitutionally protected behavior," *Chaplaincy*, 454 F.3d at 301, and the denial of the right to petition here constitutes irreparable harm *per se*.

ABA also alleges violations of the Due Process and Equal Protection Clauses, as well as a violation of the separation of powers principle, that constitute irreparable injury.  Leaving aside whether such allegations constitute irreparable injury *per se*, the circumstances of this case argue

in favor of an irreparable injury finding based on those violations.  ABA and its members are currently being deprived of their right to submit complaints under the Charter Rule.  Further, the FTA itself is unable to faithfully execute its own statute and administer its grant fund program under the Charter Rule.  As a result, King County Metro is able to ignore the charter restrictions in the FT Act and the Charter Rule without penalty.  Privately-owned charter operators, who wish to provide charter service in King County, are thus deprived of the opportunity to challenge King County Metro and protect their rights under the Act and the Charter Rule.  This deprivation not only affects those operators' financially, but upsets the fundamental balance between the rights of private citizens and the desire of public transit agencies to provide charter service that is sought in the FT Act.

Moreover, time is of the essence in determining whether the Murray Amendment is unconstitutional.  The timeliness of the assertion of constitutional rights is important. *Chaplaincy*, 454 F.3d at 300 ("'The timeliness of political speech is particularly important.'" (*quoting Elrod v. Burns*, 427 U.S. at 374 n.29)).  In this case, the primary goal of ABA and its members is to prevent King County Metro from providing charter service to Seattle Mariners baseball games during the 2010 season.  Without a preliminary injunction preventing the application of the Murray Amendment, ABA is concerned that the FTA will have no time to determine whether King County Metro's provision of that service constitutes illegal charter service.  The entire baseball season will be lost without giving privately-owned charter operators the chance to provide that service.

Finally, this is not a case in which ABA is seeking any relief in the form of money damages. There is no argument that adequate legal remedies are available absent a preliminary injunction.  *See Nat'l Mining Assoc., v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1408-09

(D.C. Cir. 1998) ("Even now the agencies identify no legal remedy as adequate.  Money damages were never sought in this action . . .").

### 3.    No Other Parties Will Suffer Substantial Injury; the Balance of Equities Favors ABA

In the face of the substantial and irreparable injury suffered by ABA and its members, no other party, either to this litigation or outside it, will suffer substantial injury.  *See, Brown*, 2009 U.S. Dist. LEXIS at *11 ("The Court did not hear testimony regarding how MTAA would be injured if Brown's requested injunction were issued, but assumes that no conceivable injury would outweigh harm to Brown's constitutional rights.").  ABA notes three possible constituencies possibly affected by a preliminary injunction: the Defendants, King County Metro, and passengers in Seattle.

The Defendants here will not suffer substantial injury.  If a preliminary injunction is granted, the effect will simply be that FTA and Administrator Rogoff would be free to enforce the Charter Rule against King County Metro.  The Defendants would simply be in the same position they would have occupied had the Murray Amendment not been adopted.  In other words, the preliminary injunction would act merely to restore the status quo.  *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984) ("[A]s then-Judge William Howard Taft realized, the status quo may not be the kind of 'condition of rest' which would justify a court's refusal to act.  He stated: 'The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief.  Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant . . . .  In such a case courts of equity issue mandatory writs before the case is heard on its merits.'" (*quoting Toledo, A.A.&N.M. Ry. Co. v.*

*Pennsylvania Co.*, 54 F. 730, 741 (C.C.N.D. Ohio 1893)).    It cannot legitimately be argued that merely enforcing a rule it has adopted would "substantially injure" the Defendants.

King County Metro, though not a party, would not suffer substantial injury, either.  In restoring the status quo and allowing the FTA to enforce the Charter Rule, King County Metro would also not be in any position it would not have occupied but for the Murray Amendment. Nor does enforcement of the Charter Rule even guarantee that King County Metro would be prevented from providing charter service.  As noted, the Charter Rule establishes a number of exceptions to the basic prohibition on transit agencies providing charter service, and King County Metro could seek an exception, as it has in the past.  Moreover, King County Metro could assert that it is not violating the Charter Rule at all, and leave it to the FTA's adjudicatory process to determine if it is.[1]  And if the FTA were to find that King County Metro is violating the Charter Rule, then the transit agency was never entitled to engage in that service in the first place.  Any remedy the FTA would impose in that instance would merely be a legitimate enforcement of the Charter Rule, and cannot be considered an "injury" to King County Metro. Thus, any assertion that King County Metro would lose charter service is speculative at best, and in any event cannot be considered an injury for the purposes of this motion.

Finally, the last constituency potentially affected by a preliminary injunction in this matter is the riding public in Seattle.  As is the case with King County Metro, however, any potential injury to these passengers is speculative.  The preliminary injunction would only act to allow the FTA to enforce the Charter Rule.  It would not guarantee that service to Mariners games or other special events would be affected.  Even if King County Metro was found to be violating the Charter Rule, the FTA has discretion in fashioning an appropriate remedy to deal

---

[1] Indeed, King County Metro has already claimed that its actions do not violate the Charter Rule. Pantuso Affidavit at 3 and Exhibit C, thereto.

with the violation.  Indeed, in 2008 the FTA granted an exception from the Charter Rule for the entire Mariners baseball season so that passengers would not be left without a transportation option.[2]  Department of Transportation Dockets, FTA-2007-0022-0075 (Decision of the Administrator in No. 2008-14, June 27, 2008).

### 4.    The Public Interest is Furthered by Striking the Murray Amendment

The public interest can only be served by vindicating constitutional rights and ensuring that FTA can faithfully execute the laws.  *Blackman*, 277 F. Supp. 2d at 82 ("Finally, the Special Master properly acknowledged the significant public interest in the proper implementation of the IDEA."); *Lightfoot*, 2001 U.S. Dist. LEXIS 25866 at *49 ("Certainly with regard to Plaintiffs' entitlement to due process, the public has an interest in ensuring that the District affords claimants the proper process prior to termination of disability benefits.").

Conversely, no public interest is served by prohibiting the FTA from determining the validity of King County Metro's service to Mariners games and other special events, especially in light of the fact that the Charter Rule remains in effect throughout the rest of the country.  It is hard to imagine that the public interest could be truly harmed by enforcement of the Charter Rule in King County Metro if the public interest is served by its enforcement everyplace else.

In fact, the public interest is better served by adjudicating the constitutionality of the Murray Amendment now to bring finality and uniformity to this issue.  As set out in the Affidavit of Peter Pantuso, at 5, other transit agencies have sought assistance from Senator

---

[2]  Even if the service from park and ride facilities to the ballparks was stopped, such a result would not rise to the level of substantial injury.  Riders would be able to take advantage of other means to get to the ballparks, by public transportation on regular routes provided by King County Metro, by other public transportation options such as taxicabs, or by their own vehicles.  Curtailing the park and ride service does not create an impossible situation for riders who want to travel to these sporting events, and cannot be a substantial injury.  It is also likely that private charter bus operators would develop shuttle service to the Mariners' games and other events that would replace the King County Metro service.

Murray's office to exempt their charter service from the restrictions of the Charter Rule. If the Murray Amendment is allowed to stand, ABA believes that many other transit agencies will seek and obtain exemptions from the Charter Rule in future appropriations bills and other acts of Congress, which will gut the protections of the Charter Rule for private bus operators and create a patchwork quilt of charter bus regulations applicable throughout differing regions of the country.

Further, no public interest is served by allowing King County Metro to provide illegal charter service. King County Metro has the right to expend FTA funds only to the extent allowed by the FTA. King County Metro's interests rise and fall with their rights under the Charter Rule and their grant agreement. Those interests can be adjudicated by the FTA. If King County Metro has no right to provide illegal charter service in the first place, then the FTA's examination, and possible restriction of their service to Mariners games and other special events, does not adversely affect the public interest. In fact, it only furthers the public interest.

Finally, as noted above, there is no potential harm to traveling public if a preliminary injunction is granted and FTA is allowed to enforce the Charter Rule. If the injunction issues, it would merely allow FTA to adjudicate a complaint brought by ABA or others. The injunction would not guarantee an outcome of such an adjudication. Further, even if the FTA finds that King County Metro is violating the Charter Rule, it has discretion to implement an appropriate remedy, one which can take into account the provision of service to Mariners games. *See* Department of Transportation Dockets, FTA-2007-0022-0075 (Decision of the Administrator in No. 2008-14, June 27, 2008).

## CONCLUSION

For the forgoing reasons, ABA submits that it has met all the elements necessary for the issuance of a preliminary injunction.  ABA has demonstrated that it has a substantial likelihood of success on the merits of each of its causes of action.  The current deprivation of ABA's constitutional rights constitutes irreparable harm.  In the case of ABA's allegations under its First Amendment right to petition, that harm is irreparable *per se*.  ABA has demonstrated that no substantial harm will result to any party – either to or outside this litigation.  Finally, the public interest favors the restoration of ABA's constitutional rights and the ability of the FTA to enforce the laws faithfully.

In light of the fundamental constitutional rights involved, and the fact that the privately-owned bus operators potentially are losing revenue while King County Metro's illegal charter service persists, ABA request expedited consideration of this preliminary injunction application pursuant to LCvR 65.1(d).

May 11, 2010                                         Respectfully submitted,


                                                    /s/ Richard P. Schweitzer
                                                    Richard P. Schweitzer
                                                    Craig M. Cibak
                                                    Richard P. Schweitzer, PLLC
                                                    1776 K Street, N.W.
                                                    Suite 800
                                                    Washington, D.C. 20006
                                                    (202) 223-3040

                                                    Counsel for the American Bus
                                                    Association, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of May, 2010, a true and correct

copy of the forgoing Application for Preliminary Injunction, together with the Affidavit of Peter

J. Pantuso and the exhibits attached thereto, were served by hand delivery, on the following

persons:

> The Honorable Peter M. Rogoff, Administrator
> Federal Transit Administration
> c/o FTA Chief Counsel
> East Building, 4th Floor
> 1200 New Jersey Avenue, S.E.
> Washington, D.C. 20590
>
> The United States Attorney for the District of Columbia
> 555 4th Street, N.W.
> Washington, D.C.  20530
>
> The Attorney General of the United States
> United States Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Washington, D.C.  20530

/s/ Richard P. Schweitzer