**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————— )
                                                      )
AMERICAN BUS ASSOCIATION, INC.,   )
                                                      )
                    Plaintiff,          )
                                                      )
          v.                                  )  Civil Action No. 10-0686 (ESH)
                                                      )
PETER M. ROGOFF, Administrator,   )
Federal Transit                            )
Administration, et al.                   )
                                                      )
                    Defendants.         )
—————————————————————— )

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
**TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

**Introduction**

The American Bus Association, Inc. ("ABA") and United

Motorcoach Association, Inc. ("UMA") have filed motions for a

preliminary injunction against the Administrator of the Federal

Transit Administration ("FTA") seeking to compel the

Administrator to enforce the Charter Service Regulations, 49

C.F.R., Part 604 ("Charter Rule"), related to the Charter

Service provided by the King County Metro Transit, Washington

Department of Transportation Division ("King County Metro" or

"KCM"), and to prohibit the Administrator from enforcing Section

172 of Pub. L. No. 111-117, § 172, 123 Stat. 3066 (Dec. 16,

2009) of the Transportation, Housing and Urban Development, and

Related Agencies Appropriation Act, commonly referred to as the

Murray Amendment.

The Murray Amendment to the Transportation Appropriation Act provides:

> None of the funds provided or limited under this Act may be used to enforce regulations related to charter bus service under part 604 of Title 49, Code of Federal Regulations, for any transit agency who during fiscal year 2008 was both initially granted a 60-day period to come into compliance with part 604 and then was subsequently granted an exception from said part.

Pub. L. No. 111-117, § 172.

Plaintiffs are National Trade Associations representing hundreds of commercial and charter bus operators throughout the United States. (ABA Motion for Preliminary Injunction ("ABA Mot.") at 3; UMA Motion for Preliminary Injunction ("UMA Mot.") at 2. Plaintiffs allege that the Murray Amendment is unconstitutional because (1) it infringes upon the right of ABA, UMA and its members to petition the government for redress of grievances in violation of the First Amendment; (2) it infringes upon their due process and equal protection rights in violation of the Fifth Amendment; and (3) it is inconsistent with the separation of powers doctrine because it effectively nullifies the Charter Rule which would otherwise enable ABA, UMA, and their members to seek adjudication of their claims against KCM before both the FTA and federal courts.

Plaintiffs have failed to satisfy the four factors necessary to obtain preliminary relief.

## Background

## The FTA Administrative Scheme

The federal transit laws, which are codified at Title 49, Chapter 53 of the United States Code, authorize the Secretary of Transportation to award grants and loans to assist States and localities in financing the planning, construction, and operation of public transportation ("transit") systems.  See generally 49 U.S.C. § 5301(f).  The Secretary has delegated these functions to the FTA Administrator pursuant to 49 C.F.R. §§ 1.45 and 1.51.  49 U.S.C. section 5323 outlines the general provisions on assistance.  Specifically, and of significance here, 49 U.S.C. § 5323(d) prohibits a grantee from providing "charter bus transportation service."  The purpose of this provision is:

> to ensure that the [federal] assistance will not enable a governmental authority or an operator for a governmental authority to foreclose a private operator from providing intercity charter bus service if the private operator can provide the service.

49 U.S.C. § 5323(d).  See also 49 C.F.R. § 604.1 (49 U.S.C. [§] 5323(d) "protects private charter operators from unauthorized competition from recipients of federal financial assistance under the Federal Transit Laws.").

To implement 49 U.S.C. § 5323(d), the FTA recently issued a revised charter regulation, 49 C.F.R. Part 604, effective April

3

30, 2008 ("Charter Rule").   49 C.F.R. Part 604 sets forth the general definitions applicable to the federal transit laws. "Charter service" includes "transportation provided by a recipient at the request of a third party for the exclusive use of a bus or van for a negotiated price." 49 C.F.R. § 604.3(c)(1).   The general rule is that a recipient of federal financial assistance may not provide charter service if a private charter operator expresses an interest and is able to provide such service.   See, e.g.,49 U.S.C. § 5323(d); 49 C.F.R. § 604.1(a).[1]

The Charter Rule, however, creates a number of exceptions to this general rule.   Three of the exceptions require Administrator approval for issuance of the exceptions. Specifically, the regulations for these exceptions provide that a recipient of federal assistance may petition the Administrator of the FTA for "an exception to the charter service regulations to provide charter service directly to a customer for":

(1)  Events of regional or national significance;

---

[1]   A private charter operator can become a "registered charter provider" by registering on FTA's charter registration website.   49 C.F.R. § 604.13.   Registered charter providers are those that want to receive notice of charter service requests directed to recipients.   Id.

    (2)   Hardship (only for non-urbanized areas under
          50,000 in population or small urbanized
          areas under 200,000 in population); or

    (3)   Unique and time sensitive events (e.g.,
          funerals of local, regional or national
          significance) that are in the public's
          interest.

49 C.F.R. § 604.11.  If an exception is sought for a unique and time sensitive event, "the petition shall describe why the event is unique or time sensitive and how providing the charter service would be in the public's interest."  49 C.F.R. § 604.11(b)(4)(iii).

Once a petition meeting the requirements of 49 C.F.R. § 604.11(b) is submitted to the Administrator, it is reviewed and a written decision denying or granting the request in whole or in part is issued.  49 C.F.R. § 604.11(c).  In reaching a decision, the Administrator "may seek such additional information as the Administrator deems necessary."  Id.  Any exception granted by the Administrator "shall be effective only for the event identified . . . ."  49 C.F.R. § 604.11(d).  The regulation provides that the Administrator may grant a "permanent or temporary exemption from FTA rules as allowed by law." 49 C.F.R. § 601.32(a).  A final decision and order of the Administrator is subject to judicial review in an appropriate

United States District Court under the Administrative Procedure
Act ("APA"), 5 U.S.C. §§ 701-706.  49 C.F.R. § 604.50.

## Factual Background

For approximately ten years King County Metro provided
public transit service for fans riding to and from Seattle
Mariners ("Mariners") home baseball games. United Motorcoach
Assn, Inc. v. Welbes, 614 F. Supp. 2d 1, 5 (D.D.C. 2009).  KCM
initiated Mariners service for the 2008 season just prior to
April 30, 2008, the effective date of the new regulations.  Id.
Because KCM wanted to continue the service, it submitted a
petition for an exception.  Initially, the Administrator denied
KCM's petition for an exception but granted a 60-day extension
to take action to obtain charter providers.  Id.  In response to
the notice by KCM, Starline, a private charter company,
expressed interest in providing service for the remainder of the
2008 season. Id.  Because an agreement could not be reached by
the interested parties, including the Mariners, the
Administrator granted an exception on a "time sensitive basis"
because the public would have insufficient shuttle services to
the Mariners games. Id. at 6.

On September 26, 2008, UMA brought suit under the
Administrative Procedure Act challenging the Administrator's
exception decision.  Id.  This Court dismissed the suit as

unripe for judicial review. Id. at 11.  The District Court decision was affirmed on appeal by an unpublished decision.

On December 16, 2009, Congress passed the Murray Amendment that precluded the use of 2010 appropriated funds to enforce the Charter Rule against KCM.  On May 3, 2010, American Bus Association, Inc. filed suit and on May 11, 2010, ABA filed a petition for preliminary injunction.  On May 4, 2010, United Motorcoach Association, Inc. filed suit challenging the Murray Amendment and on May 17, 2010 filed a motion for preliminary injunction and separately filed a request for an Advisory Opinion and a Cease and Desist Order with the Administrator of FTA.  (See UMA's Motion, Exhibit 2).  Although the Administrator may not use 2010 appropriated funds to enforce the Charter Rule against KCM, the Administrator may still issue advisory opinions under 49 C.F.R. § 604.29 and enforce other provisions of the Transportation Act and regulations.

## Argument

### I.   Plaintiffs Lack Standing to Bring This Suit.

"Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, see, e.g., Chi. & Grand Trunk Railway Co. v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892), a showing of standing 'is an essential and unchanging' predicate to any exercise of

our jurisdiction." American Chemistry Council v. Department of Transp., 468 F.3d 810, 814-15 (D.C. Cir. 2006) (citing Florida Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

In order to have standing, a plaintiff must satisfy three elements: (1) suffer an injury in fact which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. American Chemistry Council, 468 F.3d at 815 (citing Defenders of Wildlife, 504 U.S. 560). Plaintiff ABA bears "the burdens of production and of proof: [they] 'must support each element of [their] claim to standing by affidavit or other evidence' " and their " 'burden of proof is to show a substantial probability,'" GrassRoots Recycling Network, Inc. v. EPA, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (quoting Sierra Club v. E.P.A., 292 F.3d 895, 899 (D.C. Cir. 2002)). "The facts upon which a petitioner relies for its standing to sue are necessarily peculiar to it and are ordinarily within its possession." Sierra Club v. E.P.A., 292 F.3d at 901.

8

An association, such as Plaintiff ABA, "'has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" American Chemistry Council, 468 F.3d at 815 (citing United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). In order for an association to have standing, at least one of its members must have standing to pursue the action. Id. at 815, 818-19, 820 (citing Am. Library Ass'n. v. FCC, 406 F.3d 689, 696 (D.C. Cir. 2005)). Accordingly, the association "must show that at least one specifically-identified member has suffered an injury-in-fact." Id. at 820. The "standard [for associational standing] has never been that it is likely that at least one member has standing. At the very least, the identity of the party suffering an injury in fact must be firmly established." Id. Plaintiffs have the burden of producing "evidence of the imminent nature of a specific harm to a specific party when an actual harm is absent." Id. at 820-21.

9

Plaintiff ABA has failed to meet its burden of showing that it has associational standing.  ABA does not identify at least one specifically-identified member that has suffered a specific injury-in-fact or will suffer a specific imminent harm or that the alleged injury was caused by FTA.  No evidence has been presented that any ABA member has shown an interest in competing for charter services in the Seattle metropolitan region.

The Declaration of Peter J. Pantuso, President and Chief Executive Officer of ABA, fails to establish that at least one member of the ABA has standing to bring this suit.  Mr. Pantuso opines "I _believe_ that many of the registered operators in the attached list [private charter operators serving Seattle, Washington] are ready, willing and able to provide charter service to Seattle Mariners baseball games, Seattle Sounders soccer games, and other special events in the Seattle metropolitan area that is now provided by King County Metro." (Docket Entry #3-1 at ¶ 10) (emphasis added).  Pantuso has not identified any specific ABA member (let alone any private charter company) that wishes to provide charter service in the Seattle metropolitan area.  He has merely identified a list of private charter operators serving the Seattle area and hypothesized that "many of the registered operators" would be

interested in providing the services that King County Metro has been providing.

Mr. Pantuso further alleges that "[a]s a result of King County Metro's illegal charter service, these small businesses are losing revenue that is vital to their continued existence." Id. at ¶ 11.  But Pantuso's speculation regarding the operators' lost revenue is merely a conclusory allegation lacking any factual basis in the record.  The allegation is "missing the crucial causal connection tying" the alleged lost revenue to King County Metro's services rather than to some other factor, such as the current economy, high fuel prices, or other competition.  Assoc. of Flight Attendants v. Department of Transportation, 564 F.3d 462, 466 (D.C. Cir. 2009) (concluding that associational plaintiff failed to meet its burden of production under Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002) to demonstrate that its members suffered any "personal injury traceable to [DOT's] alleged unlawful conduct.")

ABA does not even allege injury to a specific member of its association and any injury that it does allege is speculative and is not supported by evidence from a member who allegedly suffered an injury.  See Defenders of Wildlife, 504 U.S. at 560 ("the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized and (b) actual or imminent,

11

not conjectural or hypothetical."); see also American Chemistry Council, 468 F.3d at 819 (holding that associations of hazardous materials manufacturers, shippers, and transporters did not have standing where there was no evidence that "any of petitioners' members have been or will be working in specific areas with safety concerns."). Furthermore, ABA's status as a national trade association that "represents the interests of approximately 700 private operators of intercity buses" (ABA Mot. At 2) is insufficient to confer standing. See American Chemistry Council, 468 F.3d at 819 ("It is not enough [to establish associational standing] to allege that petitioners' associations comprise the majority of the workers who handle hazardous materials."); AFA v. DOT, 564 F.3d at 464 – 465.

The UMA affidavit from Ken Priestly, although it mentions Starline Luxury Coaches (Starline) has "offered to, and is more than capable of, providing charter service to fans for Seattle Mariners' baseball games," does not allege a specific injury or provide the requisite evidence that Starline provided a bid to the Mariners for the charter service in question. See Exhibit A to UMA PI Motion. There is no evidence in the record demonstrating a concrete, particularized and actual injury. Generalized statements without specific evidence are not enough

12

to demonstrate an injury in fact.  Defenders of Wildlife, 504
U.S. at 560.

Neither ABA nor UMA have provided evidence to show that
they satisfy the requirements necessary for standing.
Accordingly, ABA and UMA's claims should be dismissed from this
suit.

## II.   Plaintiffs' Constitutional Challenges Face a Very High Burden

Courts must try to construe statutes in a way that avoids
constitutional problems.  "[E]very reasonable construction must
be resorted to, in order to save a statute from
unconstitutionality."  Edward J. DeBartolo Corp. v. Fla. Gulf
Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108
S.Ct. 1392, 99 L.Ed.2d 645 (1988).  When a plaintiff argues that
a statute is unconstitutional on its face, (s)he generally must
show that it is unconstitutional in every application.  In
Daskalea v. Washington Humane Soc., 577 F. Supp. 2d 82, 88
(D.D.C. 2008), the Court observed:

> In Salerno, the Supreme Court stated that a facial
> challenge to a legislative Act is, of course, the most
> difficult challenge to mount successfully, since the
> challenger must establish that no set of circumstances
> exists under which the Act would be valid. The fact
> that the ... Act might operate unconstitutionally
> under some circumstances is insufficient to render it
> wholly invalid, since we have not recognized an
> "overbreadth" doctrine outside the limited context of
> the First Amendment.

Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Accordingly, a party asserting a facial challenge to a statute bears a "heavy burden."  Id.  Since Salerno was decided, the D.C. Circuit has "invoked Salerno's no-set-of-circumstances test to reject facial constitutional challenges." Amfac Resorts, L.L. C. v. United States Dep't of Interior, 282 F.3d 818, 826 (D.C.Cir.2002), vacated in part on other grounds sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (citing James Madison Ltd., by Hecht v. Ludwig, 82 F.3d 1085, 1101 (D.C. Cir.1996); Chemical Waste Mgmt. v. EPA, 56 F.3d 1434, 1437 (D.C. Cir.1995); Steffan v. Perry, 41 F.3d 677, 693 (D.C. Cir. 1994) (en banc)); see also Nebraska v. EPA, 331 F.3d 995, 998-99 (D.C. Cir.2003).

As explained below, plaintiffs are unable to carry this "heavy burden" to establish that the Murray Amendment is constitutionally infirm.

### III. Plaintiffs Are Not Entitled to a Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  The moving party must show:

> (1) a substantial likelihood of success on the merits;
> (2) that it would suffer irreparable injury if the
> injunction were not granted; (3) that an injunction

14

would not substantially injure other interested
parties; and (4) that the public interest would be
furthered by the injunction.

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297
(D.C. Cir. 2006); see also Al-Fayed v. Central Intelligence
Agency, 254 F.3d 300, 303 (D.C. Cir. 2001); Serono Labs., Inc.
v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998); Taylor v.
Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C. Cir. 1995);
NTEU v. United States, 927 F.2d 1253, 1254 (D.C. Cir. 1991);
Randolph-Sheppard Vendors v. Weinberger, 795 F.2d 90, 110 (D.C.
Cir. 1986).  Those four factors "interrelate on a sliding scale
and must be balanced against each other."  Serono Labs., Inc.,
158 F.3d at 1318.  However, if the moving party fails to show a
likelihood of success on the merits, the court may deny the
preliminary injunction motion without reaching the other three
factors.  See Katz v. Georgetown Univ., 246 F.3d 685, 688 (D.C.
Cir. 2001).  A party's failure to establish any irreparable
injury can be equally fatal.  See CityFed Fin. Corp. v. OTS, 58
F.3d 738, 747 (D.C. Cir. 1995); Farris v. Rice, 453 F. Supp. 2d
76, 78 (D.D.C. 2006).  The movant bears the burden of
persuasion, and may obtain a preliminary injunction only upon a
"clear showing" that it is entitled to that extraordinary
remedy.  Chaplaincy of Full Gospel Churches, 454 F.3d at 297.

A.    **Plaintiffs Fail to Demonstrate Irreparable Harm.**

The Court's analysis could begin and end with "irreparable harm."  No injunction may issue in the absence of an "irreparable injury," no matter how strongly the other factors support the movant.  See CityFed Fin. Corp., 58 F.3d at 747; Farris, 453 F. Supp. 2d at 78.  The moving party bears the burden of establishing that, absent an injunction, it will suffer an injury that is "both certain and great," and that "there is a clear and present need for equitable relief to prevent irreparable harm."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  As the D.C. Circuit has recognized:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

Chaplaincy of Full Gospel Churches, 454 F.3d at 298 (emphasis in original; internal quotations omitted).  Although the Court must consider all of the elements in determining whether a preliminary injunction is viable, D.C. Courts have determined that "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors."  American Association for

Homecare v. Leavitt, 2008 WL 2580217 (D.D.C. 2008), citing

CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738,

747 (D.C. Cir.1995).

Plaintiffs' claims of injury are twofold.  They assert that

essentially any violation of their constitutional rights

constitutes irreparable injury per se and that their right to

compete for charter business for Mariners games or other major

sporting events in King County has been adversely affected,

potentially creating significant economic loss to their members.[2]

Their reliance on Chaplaincy of Full Gospel Churches, et

al. v. England, et al., 454 F.3d 290 (D.C. Cir. 2006), Elrod v.

Burns, 427 U.S. 347 (1976), and Quaker Action Group v. Hickel,

421 F.2d 1111 (D.C. Cir. 1969), for the proposition that any

alleged violation of the First Amendment no matter how slight

constitutes irreparable injury per se is misplaced.  In

Chaplaincy, this Circuit exhaustively examined Elrod, subsequent

Supreme Court cases, and Circuit Court cases and concluded that

there is not a per se rule that violations of First Amendment

rights, or for that matter, other constitutionally protected

rights, automatically constitutes irreparable harm.  The Court

---

[2]   The record appears to reflect that only one member of UMA
has an interest in providing charter service to the Mariners
games.

17

noted that Elrod stressed that "the timeliness of political speech is important." This factor was critical in its decision. Moreover, the Courts have constantly recognized that reasonable restrictions on free speech and other First Amendment protections can, under certain circumstance, withstand constitutional muster.  U.S. Postal Service v. Hustler Magazine, Inc. et al., 630 F.Supp. 867, 872 (D.D.C. 1986) (right to petition the government, like many rights, may be subject to reasonable limitations) (citations omitted).

Similarly, deprivation of due process or other constitutionally protected rights does not establish a per se irreparable injury. Lightfoot v. District of Columbia, 2001 U.S. Dist. Lexis 25866 (D.D.C. Oct. 29, 2001), citing Siegal v. LePore, 234 F.3d 1163, 1177-1178 (11th Cir. 2000)(en banc)("The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right to privacy and certain first amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether.")(emphasis supplied); Morton v. Beyer, 822 F.2d 364, 732 (3rd Cir. 1987) (even when likely to succeed on the merits of a due process claim, there is no basis for finding irreparable injury in the preliminary injunction context).

18

Plaintiffs' allegations of an inability to compete for charter business for service to Mariners games or similar sporting events in King County and a potential economic loss is insufficient to establish irreparable harm.  For example, in Bristol-Myers Squibb Co. v. Shalala, 932 F. Supp. 212, 220, 221 (D.D.C. 1996), this Court rejected a drug manufacturer's assertion that it would suffer irreparable harm based on a competitive threat from a newly introduced drug.  Similarly in Sandoz v. FDA, 439 F. Supp. 2d 26, 31-32 (D.D.C.), aff'd on other grounds, 2006 WL 2591087 (D.C. Cir. 2006), the Court held a drug manufacturer could not establish irreparable harm even if it could demonstrate that it would suffer millions of dollars in irretrievable financial loss if its products were excluded from the market place due to FDA regulatory action.  And in Mylan Pharmaceuticals v. Shalala, 81 F. Supp. 22d 30, 42-43 (D.D.C. 2000) this Court held loss profits and competitive disadvantage did not amount to irreparable harm, particularly when the plaintiff was a large and well established pharmaceutical company.

Plaintiffs' allegations of deprivation of constitutional rights fail to demonstrate irreparable injury.  The ABA and UMA have hundreds of members nationwide who compete for business all over the country who are completely unaffected by the Murray

Amendment.  UMA Mot. at 2; ABA Mot. at 3.  Although they allege
that they have members operating in the "Northwest" who would
like to compete to provide service for Mariners' games, they
fail to identify any company, except Starline, who has sought to
provide service in any meaningful way.  Moreover, all of those
companies are free to compete for other charter business
throughout the Northwest, even in Seattle.  Any limitation on
their competitiveness is de minimis and subject to reasonable
Congressional limitations.

Plaintiffs' delay in filing the lawsuit also weighs heavily
against issuance of preliminary relief.  The Murray Amendment
was passed on December 16, 2009.  UMA did not file suit until
May 4, 2010 and filed for preliminary relief on May 17, 2010.
The ABA filed suit on May 3, 2010 and filed for preliminary
relief on May 11, 2010.  See ABA Docket No. 1 and 3; see also
Mylan Pharmaceuticals, 81 F. Supp. 44.  To the extent plaintiffs
seek mandatory relief that would compel the FTA Administrator to
ignore an act of Congress (the Murray Amendment) and to enforce
the Charter Rule against KCM, such an injunction would exceed
the usual purpose of preliminary relief, which is to preserve
the status quo so as to preserve the Court's jurisdiction over
the merits of the case.  See e.g. Bradshaw v. Veneman, 338 F.
Supp. 2d 139, 144 (D.D.C. 2004)("The Court must consider the

fact that plaintiffs are not asking the Court to maintain the status quo by preventing the defendants from taking some action"). A preliminary injunction would effectively grant Plaintiffs the full relief they seek on the merits; namely, prohibiting the FTA Administrator from complying with the Murray Amendment and to "forthwith enforce the Charter Rule against King County (ABA motion, proposed order). See Dorfman v. Boozer, 414 F.2d 1168, 1173 n. 13 (D.C. Cir. 1969)("[A] preliminary injunction should not work to give a party essentially the full relief he seeks on the merits").

B.    **Plaintiffs Cannot Succeed on the Merits**

1.    **The Murray Amendment Does Not Violate the First Amendment Right to Petition**

Plaintiffs argue that the Murray Amendment violates their First Amendment rights by depriving them of the opportunity to petition the government for redress of grievances. ABA Mot. at 15; UMA Mot. at 13. Specifically, plaintiffs claim that they will be prevented from exercising their right of redress provided by the Charter Rule. ABA Mot. at 18; UMA motion at 16.

The First Amendment provides that "Congress shall make no law... abridging... the right of the people...to petition the Government for a redress of grievances." U.S. Const. Amend. I. This right includes petitioning Congress, administrative

agencies, and Courts.  California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972); United States Postal Service v. Hustler, 630 F. Supp. 867, 872 (D.D.C. 1986). However, this right, like many others, is not absolute but can be subject to reasonable limitations.  Hustler, 630 F.Supp. at 872 (citing A Quaker Action Group v. Morton, 516 F.2d at 725 (D.C. Cir. 1975)).  Further, the right to petition does not guarantee the right to participate in government, receive a favorable response to the petition, or that the government will listen to the petition.  Minnesota Board for Community Colleges v. Knight, 465 U.S. 271, 285-86 (1984);  We the People Foundation, Inc. v. United States, et al., 485 F.3d 140, 143 (D.C. Cir. 2008).

The First Amendment right to petition government does not guarantee a specific avenue of redress.  See e.g. Duke Power Co. v. Carolina Environmental Study Group, Inc., et al., 438 U.S. 59, 88 n. 32 (1978) (affirming that there is "no property, no vested interest, in any rule of the common law.") (citations omitted).  In Silver v. Silver, 280 U.S. 117, 122 (1929), the Supreme Court held that the "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." In addition, "[t]he right to petition exists in the presence of

22

an underlying cause of action and is not violated by a statute
that provides a complete defense to a cause of action or
curtails a category of causes of action." City of New York v.
Beretta U.S.A. Corp., 524 F.3d 384, 397 (2nd Cir. 2008).

Here, Plaintiffs grossly overstate the effect and
limitation imposed by the Murray Amendment on their right to
petition the government.  In the first instance both Plaintiffs
are registered lobbyists and actively lobbied Congress against
the Murray Amendment. Exhibits 1 and 2.  They were simply
unsuccessful. Knight, 465 U.S. at 285-286; We the People
Foundation, 485 F.3d at 143.  Furthermore, Plaintiffs are free
to petition Congress for a change of the law, for repeal of the
Murray Amendment in the 2011 appropriations bill, and for no
further statutory (or administrative) exceptions to the Charter
Rule.  See McCain, III v. United States, et al., 2007 WL 1127883
* 3 (D.D.C. 2007).  Plaintiffs may also comment on proposed
changes to future FTA regulations.  The Murray Amendment does
not prevent plaintiffs from petitioning the Administrator under
the Charter Rule's administrative process, obtaining a final
agency decision, and seeking judicial review of that agency
action.  The Murray Amendment does not ban FTA from issuing
advisory opinions, which UMA has invoked in this instance, by
filing a request for an Advisory Opinion and a Cease and Desist

23

Order against KCM for providing charter service to the Mariners' games for the 2010 season. UMA Mot., Exhibit. 2.  The statutory amendment simply precludes the use of 2010 appropriated funds to enforce the Charter Rule against KCM.  Finally, Plaintiffs have asserted their First Amendment rights to challenge the constitutionality of the Murray Amendment in this Court.

The statutory exclusion of KCM from the Charter Rule enforcement is within Congress's power.  Congress may create causes of action or remedies and it may also abolish causes of action and remedies. See City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 397 (2nd Cir. 2008).  The FTA statute, including the Murray Amendment, was promulgated by Congress. The regulations were created by FTA under a Congressional delegation of power to an executive agency.  The remedies established by Congress and the FTA to enforce the statue may be limited by congressional action. Cablevision Systems Corp. v. F.C.C., 597 F.3d 1306, 1310 (D.C. Cir. 2010).

The Murray Amendment does not infringe on plaintiffs' First Amendment rights.  It merely limited a statutorily created remedy by exempting KCM from the Charter Rule.  See id.; Beretta, 524 F.3d 384, 397.

## 2.   The Murray Amendment Does Not Offend Due Process.

The Fifth Amendment to the United States Constitution states that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend V. Thus, before determining due process was violated, the Court must determine that Plaintiffs have a protected property interest.  If a property interest is found, due process requirements are typically addressed in substantive and/or procedural terms. Substantive due process protects against "government power arbitrarily and oppressively exercised." County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  Procedural due process involves "the opportunity to be heard at a meaningful time and in a meaningful manner."  See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citation and internal marks omitted).  The hearing requirements are not set in stone, but rather are "flexible and call for such procedural protections as the particular situation demands."  Matthews 424 U.S. at 333 quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  To determine what process is due requires consideration of three factors: the private interest affected by official action, the risk of wrongful deprivation of that interest (through the procedures and the probable value of

additional safeguards), and the government's interest, including fiscal and administrative burdens.  Matthews at 355.

Plaintiffs' due process claim is predicated on the erroneous notion that they have a protectable property interest in the agency's recently promulgated Charter Rule that prevents Congressional action limiting the application of the Rule to KCM.  An absence of a property right in the Charter Rule, therefore, is fatal to any Fifth Amendment claim to strike down the Murray Amendment.

Plaintiffs rely on Logan v. Zimmerman Brush Co., et al., 455 U.S. 422 (1982), Tri County Industries, Inc. v. District of Columbia, 104 F.3d 455 (D.C. Cir. 1997), and Jung v. Association of American Medical Colleges, 339 F. Supp. 2d 26, 43 (D.D.C. 2004), to broadly assert that once a legislature creates a property interest, it cannot be taken away without appropriate procedural safeguards.  Unlike the current case, Logan involved an individual's claim under a state employment discrimination statute that created a specific statutory adjudicatory process to hear claims.  Logan, 455 U.S. at 424-25.  While the Logan Court stated that this "FEPA claim" was constitutionally protected, id. at 430, the protected property interest arose due to the state legislature's granting the "right to use the FEPA's adjudicatory procedures," and not due to the mere existence of a

claim.  Id. at 431.  The individual's right to the adjudicatory process was guaranteed by the state legislature but not followed by the adjudicatory agency.  Thus, the Court likened the state statutory claim to an individual entitlement, such as welfare benefits, rather than generalized access to the Courts.  Id.

But importantly, Logan found that the state "remains free to create substantive defenses or immunities for use in adjudication - or to eliminate its statutorily created causes of action altogether - just as it can amend or terminate its welfare or employment programs."  Logan, 455 U.S. at 432, citing Martinez v. California, 444 U.S. 277 (1980) (statute granting officials immunity from certain tort liability).  Here, Congress granted KCM limited immunity from enforcement of the Charter Rule.  Even if Plaintiffs arguably have a property interest in the procedures or benefits of the Charter Rule, they were properly deprived of that interest when Congress established an exemption for KCM or limited enforcement of the Charter Rule against KCM.  The Congressional declaration "provides all the process that is due."  Id. at 433 (citations omitted).  See also Shook v. District of Columbia, 132 F.3d 775, 781 (D.C. Cir. 1998) (plaintiff's right to elect members to the D.C. Board of Education was granted by Congress and could therefore be taken away by Congress); INS v. Chadha, 462 U.S. 919, 958 (1983) (once

Congress enacts legislation participation ends.  "Congress can thereafter control the execution of its enactment only indirectly by passing new legislation.").

Plaintiff's reliance on Jung v. Association of American Medical Colleges, et al., 339 F. Supp.2d 26 (D.D.C. 2004), is equally misplaced.  In Jung, plaintiffs, medical school graduates, currently or formerly enrolled in residency programs brought action against the institutions and organizations involved in sponsoring and administering residency programs for antitrust violations.  During the pendency of the litigation Congress enacted a rider to an unrelated bill essentially exempting the defendants from certain provisions of the antitrust laws and imposed certain evidentiary restrictions that had a significant impact on their enforcement of their cause of action under the antitrust laws.[3]  Plaintiffs' constitutional challenge under the due process clause, equal protection clause, and separation of powers doctrine was rejected.  Id. at 40, 43.

---

[3]   Like Plaintiffs here, plaintiffs in Jung complained that the rider was passed with "no hearings, no testimony, no significant debate."  The District Court found that, absent a valid constitutional challenge, the responsibility of the Court is to interpret and apply the statute.  Jung, 339 F.Supp. at 40. See also Action for Children's Television v. FCC, 932 F.2d 150-51 (D.C. Cir. 1991) (Appropriations rider does not make it any less of law); Great Old Broads for Wilderness v. Kempthorne, 452 F.Supp.2d 71, 81 (D.D.C. 2006) (Congressional appropriation riders amend all underlying statutes).

The Court rejected plaintiffs' argument that Congress' amendment denied them their due process rights, distinguishing Logan upon which the plaintiffs relied.  The Court noted that the Supreme Court did not conclude that the Logan litigants had a due process right to adjudication on the merits.  Id. 339 F.Supp. at 43.  Rather, it was a denial of due process where the legislature created a property interest in the cause of action and then the agency took it away without providing the party with any judicial forum.  Important to Logan was that the agency responsible for handling adjudicatory procedures either negligently or inadvertently failed to comply with them.  There was no legislative modification of the procedures.  Id.

Similarly, Tri County Industries, Inc. v. District of Columbia, 104 F.3d 455 (D.C. Cir. 1997), fails to aid Plaintiffs' cause.  Plaintiff Tri County had met all the regulatory prerequisites and obtained a building permit to convert a warehouse into a facility for its business.  Tri County had completed some of the renovating work on the building.  D.C. revoked the building permit and plaintiff filed a 42 U.S.C. § 1983 claim in federal court.  This Court rejected plaintiff's substantive due process claim but found a violation of procedural due process.  The D.C. Code provided for a stop work order when work is performed "in an unsafe and dangerous

manner."  In <u>Tri County</u>, the building permit was not suspended for the reason specified in the code but because of an erroneous statement made in a public meeting unrelated to the code provision.  The Court noted that the property interest protected was the entitlement to "continue construction without unfair interference" where "any interruption of construction would be very costly."  <u>Id</u>. at 104 F.3d 461.

Here, the Murray Amendment has a legitimate legislative purpose and was a rational means of correcting a perceived problem with the Charter Rule as applied to KCM.  Although Plaintiffs may disagree with the policy of the Murray Amendment, there is, as shown below, a rational basis for the Amendment. See <u>Jung</u>, 339 F. Supp. at 45, citing <u>Hammond v. United States</u>, 786 F.2d 8, 13 (1st Cir. 1986) ("plaintiff has not met the burden of showing that the statute is arbitrary and irrational in purpose and effect" and not "reasonably related to a legitimate congressional purpose.").

3.    **The Murray Amendment Does Not Offend Equal Protection.**

A legislature that creates economic distinctions "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  <u>Beach Communications</u>,

508 U.S. at 313.   "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'"   Heller v. Doe by Doe, 509 U.S. 312, 319 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) (rational basis review applied to state enactment).[4]  "Nor does it authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'"   Id. (quoting New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam)).  Thus, the Court must accord the Murray Amendment "a strong presumption of validity."   Id.; see also PBGC, 467 U.S. at 729-30 (noting in a due process challenge to the retroactive effect of economic legislation "the strong deference accorded legislation in the field of national

---

[4]   Plaintiffs' reliance on Ruggiero v. FCC, 317 F. 3d 239 (2003), Community-Service Board of Mid-America, Inc. v. FCC, 593 F.2d 1102 (D.C. Cir. 1978), and News America Publishing Inc., v. FCC, 844 F.2d 800 (D.C. Cir. 1988), for a heightened rational basis scrutiny test is misplaced.  These cases involved challenges to First Amendment protections of free speech and restrictions on broadcasting to the public rather than economic regulation that has a presumption of validity against an Equal Protection challenge.  Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976).  Contrary to Plaintiff's assertion, News America is not "strikingly similar" to the situation here.  The Murray Amendment does not single out a charter company for adverse treatment.

economic policy").  "[A] legislative choice is not subject to
courtroom factfinding and may be based on rational speculation
unsupported by evidence or empirical data." Id. at 315.
Rather, "[t]he burden is on the one attacking the legislative
arrangement to negative every conceivable basis which might
support it." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S.
356, 364 (1973) (internal quotation marks omitted).  Finally,
"courts are compelled under rational-basis review to accept a
legislature's generalizations even when there is an imperfect
fit between means and ends" because a classification subject to
rational basis review does "not fail rational-basis review
because it is not made with mathematical nicety or because in
practice it results in some inequality." Heller, 509 U.S. at
321 (citation and internal marks omitted).

     The Murray Amendment addresses competing economic interests
of private charter companies in the Seattle region and the
public's interest in affordable transportation to community
supported sporting events. See e.g., Duke Power Company v.
Carolina Environment Study Group, Inc. et al., 438 U.S. 59, 83
(1978) (economic regulation is the "legislative effort to
structure and accommodate 'the burdens and benefits of economic
life.'" (citations omitted)).  According to Senator Murray the
amendment was in ". . . direct response to numerous complaints

that were logged by area fans and sports organization." She
concluded that the Charter Rule application in Seattle "[had]
gotten between fans and an affordable way to get to games in
[the] region." Exhibit 3. The Senator noted that the Charter
Rule resulted in specific problems in the Seattle region,
"including private charters [sic] operations that were unable to
accommodate handicapped fans, drastically increased fees for
service, inconvenient and delayed staging and increased
congestion." Exhibit 3. Moreover, Senator Murray is addressing
the issue on a larger scale as the Senate undertakes
reauthorization of a critical transportation bill this year. Id.

Where, as here, there are "'plausible reasons' for
Congress' action," the Court's inquiry ends. Beach
Communications, Inc., 508 U.S. at 313; see also Jung, 339
F.Supp. at 45. Moreover, Congress has often exempted state
specific projects from generally applicable federal laws. See
National Coalition to Save Our Mall, et al. v. Norton, et al.,
161 F.Supp.2d 14, 26, citing Sequoyah v. Tennessee Valley Auth.,
480 F. Supp. 608, 611-12 (E.D. Tenn. 1979) (finding Congress
exempted certain projects of the Tennessee Valley Authority from
the Endangered Species Act) aff'd. 620 F.2d 1159 (6th Cir.),
cert. denied, 449 U.S. 953 (1980). Finally, the Conference
Report directed the Office of the Inspector General to study the

33

effect of the charter tour regulations on the quality and the
price of transit services across the board, thereby
demonstrating congressional concern over the impact of the
effect of the Charter Rule.  See H.R. Rep. No. 111-366 at 424
(2010).

### 4.   The Murray Amendment Does Not Violate the Separation of Powers Doctrine.

Plaintiffs argue that the Murray Amendment violates the
separation of powers doctrine because it encroaches on both
executive and judicial power.  ABA Mot. at 26-29 and UMA Mot. at
23-24.  They make three arguments.  First, Plaintiff ABA asserts
that the Murray Amendment "encroaches on the executive branch's
ability to enforce the Charter Rule, and to effectively oversee
its grant funds, by removing the FTA's power to conduct
investigations into Charter Rule violations by King County
Metro."  ABA Mot. at 26.  Second, it is an unconstitutional
legislative interference with FTA's adjudication of complaints
brought by privately-owned charter operators.  Id. and UMA Mot.
at 24.  Third, it infringes on the judiciary's ability to hear
appeals of final agency actions.  ABA Mot. at 29.  None of
Plaintiffs' arguments are valid.

The doctrine of separation of powers is "one of the
organizing principles of our system of government."  Nixon v.

Adm'r of Gen. Servs., 433 U.S. 425, 469, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). "It is ... essential to the successful working of this system that the persons entrusted with power in any one of [the] branches [of government] shall not be permitted to encroach upon the powers confided to the others." Kilbourn v. Thompson, 103 U.S. 168, 191, 26 L.Ed. 377 (1880). "Although not expressly included in the Constitution itself, the principle of separation of powers is implicit in the first three articles of the Constitution that define separate roles for the legislative, executive, and judicial branches." Free Enterprise Fund v. Public Co. Accounting Oversight Bd., 537 F.3d 667, 678 (D.C. Cir. 2008) (internal citations and footnote omitted).

Article III, by vesting the "judicial Power" in the judiciary, U.S. Const. Art. III, §§ 1, 2, protects against invasion of the adjudicative function. Thus, as the Supreme Court has noted, "the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power not merely to rule on cases but to decide them, subject to review only by superior courts in the Article III hierarchy-with an understanding, in short, that a judgment conclusively resolves the case because a 'judicial Power' is one to render dispositive judgments." Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19 (1995)

(quotations and citation omitted).  Congress is therefore constitutionally barred from "retroactively commanding the federal courts to reopen final judgments."  Id. at 219 (emphasis added).  Congress also could not specify a finding of fact from the record in a particular case or controversy.  Similarly, Congress could not require that the judiciary must reach a decision in violation of the Constitution.  Cf. Yakus v. United States, 321 U.S. 414, 468 (1944) (Rutledge, J., dissenting) (requiring courts to "enforce unconstitutional laws or statutes" would violate "the constitutional integrity of the judicial process").

Plaintiff ABA alleges that the "Murray Amendment has 'completely stripped' the FTA and its Administrator of the ability to enforce the Charter Rule[]" "in relation to King County Metro, and to adequately oversee the lawful use of its grant funds to that transit agency."  ABA Mot. at 27-28.  The Murray Amendment effectively made KCM immune from enforcement of the Charter Rule.  Grants of immunity and abolitions of congressionally-created rights through legislation are neither unusual nor unconstitutional.  See Jung v. Association of American Medical Colleges, 339 F.Supp.2d 26, 42 (D.D.C. 2004), aff'd. 184 Fed.Appx. 9, 12 (D.C. Cir. 2006),cert. denied,549 U.S. 1156 (2007)(finding that statute which exempted from

antitrust prosecution all claims that directly challenged the legality of graduate medical resident matching programs did not violate the separation of powers doctrine); <u>Shook v. District of Columbia</u>, 132 F.3d 775, 781 (D.C. Cir. 1998) (plaintiff's right to elect members to the D.C. Board of Education was granted by Congress and could therefore be taken away by Congress); <u>INS v. Chadha</u>, 462 U.S. 919, 958 (1983) (once Congress enacts legislation participation ends.  "Congress can thereafter control the execution of its enactment only indirectly by passing new legislation.").  The Murray Amendment is a constitutional exercise of Congressional power.

Contrary to Plaintiffs' allegations, the Murray Amendment is not an unconstitutional interference with FTA's adjudication of complaints brought by privately-owned charter operators. Plaintiff ABA maintains that the Murray Amendment "improperly encroaches on the judicial function of the FTA by completely stripping it of any power to hear disputes that relate to King County Metro."  ABA at 29.  ABA's argument is factually incorrect and legally invalid.  FTA may still issue advisory opinions regarding KCM's compliance/non-compliance with the Charter Rule.  Moreover, the Amendment is constitutional because, even though Congress may not "prescribe a rule for the decision of a cause in a particular way," <u>United States v. </u>

_Klein_, 80 U.S. 128, 147 (1871), this "prohibition does not take hold when Congress amend[s] the applicable law[]" (internal quotations omitted).  _Plaut v. Spendthrift Farm, Inc._, 514 U.S. 211, 218 (1995)(quoting _Robertson v. Seattle Audubon Soc._, 503 U.S. 429, 441 (1992)); see _Jung v. Association of American Medical Colleges_, 339 F.Supp.2d 26, 40-41 (D.D.C. 2004), _aff'd._ 184 Fed.Appx. 9, 12 (D.C. Cir. 2006),_cert. denied_,549 U.S. 1156 (2007) (citing _Imprisoned Citizens Union v. Ridge_, 169 F.3d 178, 187 (3d Cir.1999) (quoting _Robertson_, 503 U.S. at 438)("When a statute compels changes in the law, not findings or results under old law, it merely amends the underlying law, and therefore is not subject to a _Klein_ challenge.")(internal quotations omitted).  When Congress enacted the Amendment it did not violate the separation of powers doctrine because it "d[id] not merely direct the outcome of cases, but change[d] the applicable law"[5] to provide immunity to KCM.  See _City of New_

---

[5]Plaintiff   UMA's   assertion   that   the   Amendment "predetermin[es]" the outcome for charter operators who file a complaint against KCM because it "den[ies] them access to Article III 'court,'"is nothing more than an attempt to create a constitutional violation where none exists.   See _National Coalition to Save Our Mall v. Norton_, 161 F.Supp.2d 14, 23 n. 6 (D.D.C. 2001), _aff'd._ 269 F.3d 1092 (D.C. Cir. 2001), _cert. denied_, 537 U.S. 813 (2002) (rejecting the plaintiffs' argument that by "precluding judicial review, Congress has effectively forced this [Article III] court to rule in favor of the government.").

York v. Beretta USA Corp., 524 F.3d 384, 396 (2d Cir. 2008).

The Murray Amendment does not unconstitutionally infringe on the judiciary's ability to hear appeals of final agency actions.  "[T]here is an important difference between Congress telling this court how it should decide a particular case (expressly prohibited by Klein) and Congress withdrawing jurisdiction to decide a particular case[.]" National Coalition to Save Our Mall v. Norton, 161 F.Supp.2d 14, 22 (D.D.C. 2001), aff'd. 269 F.3d 1092 (D.C. Cir. 2001), cert. denied, 537 U.S. 813 (2002).  In the instant case, Congress removed funding for the enforcement of the Charter Rule against KCM.  The Murray Amendment does not alter the subject matter jurisdiction of any federal court.  Even if its ultimate effect is to preclude the judiciary from hearing appeals concerning the Charter Rule's application to KCM, there is no constitutional violation. Congress may exercise its authority under the Administrative Procedure Act to dictate what agency decisions are subject to judicial review.  Id. (citing Block v. Community Nutrition Institute, 467 U.S. 340, 345-46 (1984), Heckler v. Chaney, 470 U.S. 821, 828 (1985)).  Congress has the power to determine the subject matter jurisdiction of federal courts.  See Bowles v. Russell, 551 U.S. 205, 212, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) ("Within constitutional bounds, Congress decides what

cases the federal courts have jurisdiction to consider"). To the extent that the Murray Amendment deprives federal courts of jurisdiction over appeals concerning the Charter Service Rule's application to KCM, this is nothing more than a legitimate exercise of that constitutionally granted power.

The Murray Amendment does not violate the separation of powers doctrine. It is a constitutional exercise of Congress' legislative power.

**C.  Enjoining Enforcement of the Murray Amendment Would Cause Harm to Third Parties and Would Be Contrary to the Public Interest.**

The remaining two elements of the preliminary injunction analysis also favor denial of Plaintiffs' Motions. These factors require the Court to evaluate the harm others would suffer if the injunction were granted, and to determine whether injunctive relief would promote the public interest. See Chaplancy of Full Gospel Churches, 454 F.3d at 27; Serono Labs, Inc., 158 F.3d at 1318. Enjoining the Administrator of the FTA from enforcing the Murray Amendment is not in the public interest and would harm third parties.

The Murray Amendment was enacted to restore KCM's ability to provide affordable service to a number of major sporting events for Seattle fans and eliminate specific problems in the Seattle region. (Exhibit 3). The Murray Amendment was in

response to complaints from fans and sports organization and designed to provide more reasonable and efficient service to the public for community supported sports events.  An injunction would create the exact harm the Murray Amendment was designed to alleviate.  Promoting the expressed public interest in affordable, convenient, and efficient transportation to games in Seattle outweighs Plaintiffs' potential (or speculative) economic loss.

## Conclusion

For the foregoing reasons, the Plaintiffs' Motions for Preliminary and Permanent Injunctions should be denied.


Respectfully Submitted,


RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney


RUDOLPH CONTRERAS, D.C. BAR # 434122
Chief, Civil Division


By: _/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205
Diane.Sullivan@usdoj.gov

By:  _/s/_____
LAUREN J. KARAM
Special Assistant United States
Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-9150
Lauren.Karam2@usdoj.gov

**Of Counsel:**

NANCY-ELLEN ZUSMAN
Assistant Chief Counsel for
Litigation and Regional Operations
Federal Transit Administration
200 W. Adams, Suite 320
Chicago, IL 60606